Filed 10/16/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GREEN VALLEY LANDOWNERS ASSOCIATION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF VALLEJO, <br><br> Defendant and Respondent. | A142808 <br><br> (Solano County <br> Super. Ct. No. FCS042938) |

In this class action comprised of nonresident water customers, plaintiff Green Valley Landowners Association filed a complaint seeking to preserve its alleged right to continue receiving water at reasonable rates from an historical water delivery system owned and operated by defendant City of Vallejo (City). The trial court sustained the City's demurrer as to all 12 causes of action contained in the complaint without leave to amend. Plaintiff contends the court's rulings are legally erroneous. We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

## I. *Factual Background*[1]

The Lakes Water System (LWS) was created in the late 1800's through the early 1900's to provide the City with potable water. The City first constructed a diversion dam coupled with a 14-inch transmission pipeline, which brought water from Solano County's Green Valley to the City (the Green Line). After completing the dam, the City created

---

[1] We take the facts from the allegations in the complaint.

two reservoirs, Lake Frey (completed in 1894) and Lake Madigan (completed in 1908). The LWS was one of the first municipal water projects in California.

Lake Frey and Lake Madigan were soon insufficient to meet the demands of the City's rapidly growing population. The City then applied for a permit to store 37,000 acre-feet of water in the hills above Napa County's Gordon Valley. Subsequently, the City constructed a dam and reservoir in Napa County known as Lake Curry (completed in 1925), along with a 24-inch transmission line to transport water from Lake Curry to the City (the Gordon Line). Upon completion, the LWS consisted of three large reservoirs, two dams, thousands of acres of land and watershed, and dozens of miles of municipal-sized pipes, which conveyed needed water to the City.

In order to transport the water from the three reservoirs, the City acquired easements from some of the property owners along the Green Line, the Gordon Line, and elsewhere within the LWS service area. In exchange for these easements, the City agreed in writing to provide a certain quantity of "free water" to the owners of the servient estates.[2] In addition, the City agreed in writing to provide certain quantities of "free water" to other nonresident customers in exchange for riparian water rights. Over the decades, the City agreed to provide potable water to other nonresident customers. These connections were made without a master plan.

From 1893 through the 1950's, the City's municipal water needs were met exclusively by the LWS. In the 1950's, the City obtained water rights from the Sacramento River Delta and contracted for water from the Solano Project.

In 1992, water quality from Lake Curry ceased to meet water treatment standards adopted by the California Department of Health Services. The City elected to stop using Lake Curry as a water source, closing a valve on the Gordon Line and stopping the flow

---

[2] In other instances, the City condemned by eminent domain the property needed for the easements.

2

of LWS water to the City. The City then passed an ordinance (the 1992 Ordinance) shifting 100 percent of the cost of operating the LWS to its approximately 809 nonresident customers. Prior to 1991, these nonresidents had shared the cost of the LWS with approximately 30,000 metered connections within the City. As a result of the 1992 Ordinance, water rates for the nonresident customers increased by over 230 percent.

The City passed additional water rate increases by ordinances enacted in 1995 (the 1995 Ordinance) and 2009 (the 2009 Ordinance). In addition to increasing water consumption charges, the ordinances increased the fixed service charges to the nonresident customers of the LWS. Plaintiff alleges in its complaint that current water rates within the LWS are among the highest in the state.[3]

On June 9, 2009, plaintiff, on behalf of the purported class of nonresident LWS customers (the Class), entered into a tolling agreement with the City (Tolling Agreement). The Tolling Agreement tolls "any applicable statutes of limitations regarding a potential challenge to the rate increase [which occurred in 2009]." The Tolling Agreement has been extended 10 times, and expired on December 31, 2013.

According to plaintiff, the City has grossly mismanaged and neglected the LWS, placing the burden on the Class to fund a deteriorating, inefficient, and costly water system that is spread over an "incoherent service area." In addition to water treatment plant improvements made between 1997 and 2005 that cost almost $8 million, replacement cost for a 10-mile section of the Gordon Line and a six-mile section of the Green Line are expected to be over $12 million. All of these costs have been, or will be, passed on to the LWS's nonresident customers. Plaintiff did not become aware of these unfunded liabilities until June 2013. Previously, the City had represented that the LWS

---

[3] According to plaintiff's opening brief, the average bimonthly water bill for residential members of the Class is now over $400, or approximately 400 percent more than the average City customer water bill.

was free of liabilities and debt, even though it performed "virtually no capital improvements to or replacements of the infrastructure" between 1894 and 1992.

Plaintiff also alleges that the City had engaged in negotiations with a private investor-owned utility to purchase the LWS. Reportedly, the City will only consider selling the LWS to plaintiff (or to a water district or service district created by plaintiff) for a sum that is almost $3 million over its "already flawed appraised value of the LWS." The extra sum reportedly represents a loan or subsidy that the City claims it extended to LWS customers prior to 2009. Additionally, plaintiff complains that certain fees paid by Class members have not been earmarked for LWS improvements as required by City ordinances, but instead have been improperly used by the City for other unrelated purposes.

## II.    *Procedural History*

On December 3, 2013, plaintiff filed and served a claim pursuant to Government Code section 910 on behalf of itself and the Class.[4]

On January 23, 2013, plaintiff filed the operative complaint against the City. The class action complaint states 12 causes of action, comprised of claims for breach of implied contract, breach of implied covenant of good faith and fair dealing, breach of contract (third party beneficiary), breach of duty to charge reasonable water rates, breach of fiduciary duty, specific performance, declaratory relief, and accounting, along with four separate claims for injunctive relief.

On February 24, 2014, the City filed a general demurrer to the complaint.

On June 11, 2014, the trial court issued a tentative ruling sustaining the City's demurrer without leave to amend.

---

[4] All further statutory references are to the Government Code except as otherwise indicated.

On August 21, 2014, plaintiff filed its notice of appeal.[5]

On August 22, 2014, the trial court filed its order affirming its tentative ruling, granting the demurrer without leave to amend.

On October 1, 2014, the trial court filed its order dismissing the lawsuit and entered final judgment for the City.

## DISCUSSION

### I. Standard of Review

"Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the well-pleaded allegations in plaintiff's . . . complaint. ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)

"While the decision to sustain or overrule a demurrer is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion. [Citations.] When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect

---

[5] Although plaintiff's appeal was premature because it was taken from the nonappealable order sustaining the demurrer without leave to amend, we treat it as being from the subsequently entered final judgment of dismissal. (See, e.g., *Maxwell v. Dolezal* (2014) 231 Cal.App.4th 93, 96, fn. 1 ["We deem appellant's premature appeal, filed after the nonappealable order sustaining the demurrer without leave to amend and before the judgment of dismissal was entered, to be an appeal from the subsequent judgment of dismissal."].)

5

by amendment.  [Citations.]  A trial court abuses its discretion if it sustains a demurrer without leave to amend when the plaintiff shows a reasonable possibility to cure any defect by amendment.  [Citations.]  If the plaintiff cannot show an abuse of discretion, the trial court's order sustaining the demurrer without leave to amend must be affirmed." (*Trader Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 43–44.)

The plaintiff's "burden of demonstrating a reasonable possibility to cure any defect" (*Trader Sports, Inc. v. City of San Leandro*, *supra*, 93 Cal.App.4th at p. 43) is not pro forma.  " 'To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." [Citation.] . . .  The plaintiff must clearly and specifically set forth . . . factual allegations that sufficiently state all required elements of that cause of action.  [Citations.] Allegations must be factual and specific, not vague or conclusionary.' " (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1491, quoting *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43–44.)

## II.      The Demurrer Was Properly Sustained as to the Implied Contract Claims

### A.  Causes of Action

Plaintiff represents that its implied contract claims, which it identifies as the first (breach of implied contract), second (breach of implied covenant of good faith and fair dealing) and 10th (specific performance) causes of action, are based on its theory that the City is contractually obligated to share in the cost of the LWS pursuant to what plaintiff refers to as the "Historic[al] Cost Sharing Ratio."[6]  The gist of these claims is that the City made an implied promise that it would "indefinitely share in the cost of operating, maintaining and improving the LWS and that the costs would be shared according to the

---

[6] In the complaint, the "Historic[al] Cost Sharing Ratio" is identified as the percentage of LWS costs paid by City residents (at least 98 percent), as compared to nonresident LWS customers (less than 2 percent) up until 1992.

6

Historic[al] Cost Sharing Ratio," a promise that it allegedly breached when it passed the 1992, 1995, and 2009 Ordinances.

As the City notes, plaintiff's third cause of action is also based on an implied contract theory.[7] The City also correctly observes that the complaint's 10th claim, which is for specific performance of the alleged implied agreement, actually constitutes a remedy and is not itself a cause of action.[8]

### B. Implied Contracts

"The terms of an express contract are stated in words. [Citation.] The existence and terms of an implied contract are manifested by conduct. [Citation.] The distinction reflects no difference in legal effect but merely in the mode of manifesting assent." (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178.) The essential elements of a claim of breach of contract, whether express or implied, are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff. (*Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830; *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1332.) The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract. (See *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683–684, 690;

---

[7] The third cause of action for breach of contract (third party beneficiary) focuses on the LWS's easements and asserts the City "breached its obligation to the Class when it divested itself of any obligation to pay for the LWS and forced the members of the Class to pay for and subsidize the provision of free water to the servient property owners. In essence, [the City] transferred its contractual obligation to provide and pay for the free water and has improperly shifted that obligation to the class."

[8] There are no separate causes of action for specific performance or injunctive relief, which are instead remedies. (See, e.g., *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1360, fn. 2 [specific performance and injunctive relief are equitable remedies and not causes of action for injuries]; *Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154, 162 [injunctive relief].)

*Gruenberg v. Aetna Ins. Co*. (1973) 9 Cal.3d 566, 576 [since noninsurer defendants in bad faith case were not parties to the insurance contracts, they were not subject to an implied duty of good faith and fair dealing].)

The trial court found the City could not be subjected to liability under an implied contract theory, first noting the City's charter does not contain any provisions specifically addressing contract formation. As the charter is silent, the court concluded the City's contracting procedures are governed by the general law provision found in section 40602. That section applies to the manner of contract formation and provides, in part, "[t]he mayor shall sign . . . [¶] . . . [¶] *[a]ll written contracts and conveyances* made or entered into by the city." (Italics added.)

The trial court also cited to *G.L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087 (*Mezzetta*). In *Mezzetta,* the appellate court concluded that certain municipal code provisions together with section 40602 precluded the general law city of American Canyon from entering into an oral agreement. The agreement had allegedly obligated the city to provide the plaintiff with wastewater discharge services. The court reasoned: "[I]mplicit in the relevant statutes, when read together, is the requirement that contracts with the City be *in writing,* approved by the city council, approved as to form by the city attorney, and signed by either the mayor or the city manager. [Citations.]" (*Mezzetta,* at p. 1093, italics added.) The court held that the alleged oral agreement was void because it failed to comply with this requirement: "[B]ecause the statutes in question specifically set forth the ways in which the City may enter into contracts, any other methods of contract formation—even though not explicitly prohibited by the statutes— are invalid. [Citations.] . . . To conclude otherwise would undermine the City's clear intent to ' "ensure that expensive decisions are not hastily made." ' " (*Id.* at pp. 1093– 1094, fn. omitted.)

Plaintiff does not dispute that the City's charter is silent with respect to the manner of contracting. It also concedes the "implied agreement to share in the cost of the LWS

8

was never memorialized in writing."  It contends section 40602 does not apply because charter cities "are independent of the general laws of the State on all matters of municipal affairs."  This is true, according to plaintiff, even as to matters on which the charter is silent.  In so arguing, plaintiff construes cases that favor charter city ordinances over conflicting general law provisions as standing for the proposition that general laws have no application to charter cities in the absence of ordinances or charter provisions that expressly invoke those general laws.  This construction is not supported by case law.

### C. General Law and Charter Cities

" 'The Government Code classifies cities as either "general law cities" (cities organized under the general law of California) or "chartered cities" (cities organized under a charter).' "  (*City of Orange v. San Diego County Employees Retirement Assn.* (2002) 103 Cal.App.4th 45, 52.)  It is well settled that the method by which a city has power to enter into a contract may be controlled by its charter.  (*Loop Lumber Co. v. Van Loben Sels* (1916) 173 Cal. 228, 232; *First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 661 (*First Street*).)  Further, unless the city charter authorizes such, no implied contract rights can arise.  (*Reams v. Cooley* (1915) 171 Cal. 150, 153–154; *First Street,* at p. 667.)

Section 201 of the City's charter states:  "The City shall have the power to act pursuant to procedure established by any law of the State unless a different procedure is required by this Charter."[9]  The court below correctly noted that the manner in which a city may form a contract is a municipal affair, and that the City's charter, which could have validly included contract formation provisions, "does not specifically prescribe how its contracts must be executed."  The court concluded the City could thus rely on section 40602 for guidance.  Plaintiff contends charter cities are *never* subject to general laws,

---

[9] The City adopted its charter in 1970.

9

including section 40602, *even if* their charters are silent on the subject matter. We are not persuaded.

Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs. Article XI, section 5, subdivision (a) of the California Constitution provides: "It shall be competent in any city charter to provide that the city governed thereunder *may* make and enforce *all ordinances and regulations in respect to municipal affairs,* subject only to restrictions and limitations provided in their several charters *and in respect to other matters they shall be subject to general laws.* City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs *shall supersede all laws inconsistent therewith.*" (Italics added.) As the italicized provisions indicate, chartered cities are permitted, but not required, to make and enforce laws governing municipal affairs. If a city's charter is silent as to a particular matter, even one concerning a municipal affair, courts have opined that the matter will be subject to the general laws of this state. (See, e.g., *McLeod v. Board of Pension Commissioners* (1970) 14 Cal.App.3d 23, 29–30 (*McLeod*) ["[a] city, such as Los Angeles, which operates under a freeholders' charter is exempt from the operation of general laws with respect to all 'municipal affairs' covered by the charter. [Citation.] . . . However, *where the charter contains no special procedure concerning a municipal subject, the general laws govern.*"] (Italics added, fn. omitted.))

As noted in section 201 of the Vallejo Charter, the City is permitted to follow the laws of California regarding contract formation, i.e., section 40602, unless "a different procedure is *required* by this Charter." And section 200 of the Vallejo charter expressly permits the City to "exercise any and all rights [and powers] . . . established, granted or prescribed by the general laws of the State." Thus, as the trial court below concluded, the Vallejo Charter has effectively adopted the procedures set forth in section 40602 over any

10

other municipal-based approach to government contracts. Simply stated, the City has not opted to create a different contracting procedure under its Charter.[10]

We concur with the holding of *McLeod, supra*, 14 Cal.App.3d 23. That decision follows established principles in addressing charter cities and the effect of state statutes on such municipalities when their charter does not provide specific guidance on a matter of municipal concern. We disagree with plaintiff's characterization of *McLeod* as an isolated decision. (See *Civic Center Assn. v. Railroad Comm.* (1917) 175 Cal. 441, 445 ["With respect to matters not municipal, or municipal affairs upon which the charter [is] silent, the provisions of any general law [i.e. state statute] pertaining thereto would control the subject."]; *Armas v. City of Oakland* (1960) 183 Cal.App.2d 137, 138–139 ["Although Oakland is a charter city, plaintiffs concede that its charter and ordinances prescribe no procedure for street closing and that thus the procedural provisions of state law must be followed, even if the function be municipal in character"]; *Hyde v. Wilde* (1921) 51 Cal.App. 82, 86 ["Where no particular provisions are made covering a matter falling within the classification of a 'municipal affair,' the state law controls."])

In arguing otherwise, plaintiff relies on *Butterworth v. Boyd* (1938) 12 Cal.2d 140 (*Butterworth*) for the proposition that charter cities are not bound by the general laws of this state with respect to municipal affairs, even as to matters that the charter does not address. In *Butterworth,* a proposed charter amendment to the charter of the City and

---

[10] The Vallejo charter contains express language dealing with contracting that is compatible with section 40602. These charter provisions ensure City taxpayers are protected from implied obligations. Charter section 716 prohibits any City expenditures without the approval of the city council. Also, section 717 allows the city manager to make contracts only with the approval of the council and an appropriation. The Municipal Code of Vallejo has similar express restrictions. Section 3.20.045 allows particular officials of the City to make contracts in stated dollar amounts. Written bids and proposals in contracting are required under section 3.20.222. Additionally, section 3.22.010 mandates chapter 3.22 of the Vallejo Municipal Code applies to all government contracts. These charter provisions and municipal ordinances facilitate the operation of section 40602 and its requirements for express contracts.

11

County of San Francisco was approved by the electorate, and became effective by concurrent resolution of the Legislature. The amendment called for a " 'health [care] system' " for municipal employees. (*Id.* at p. 143.)

In deciding whether the establishment of a health care system qualified as a " 'municipal affair,' " the Supreme Court observed, "In the early stages of municipal home rule in California, the charter prevailed only where it expressly covered the particular power exercised. Under the liberalizing constitutional amendment of 1914, the charter is not a grant of power but a restriction only, and the municipality is supreme in the field of municipal affairs *even as to matters on which the charter is silent.*" (*Butterworth, supra,* 12 Cal.2d at p. 146, italics added.) As is apparent, the language plaintiff relies on from *Butterworth* simply states the well-established principle that chartered cities may act independent of general law with respect to matters deemed "municipal affairs," regardless of whether their charters address the specific municipal affair that is at issue. It does not stand for the proposition that general laws *never* apply to chartered cities, particularly in the absence of conflicting municipal ordinances or regulations.

As the *Butterworth* court stated: "The purpose of the constitutional provisions was to make municipalities self-governing and free from legislative interference with respect to matters of local or internal concern. 'It was to enable municipalities to conduct their own business and control their own affairs, to the fullest possible extent in their own way. It was enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and *to give that municipality the exclusive privilege and right to enact direct legislation* which would carry out and satisfy its wants and needs.' " (*Butterworth, supra,* 12 Cal.2d at p. 147, italics added.) Thus, *Butterworth* merely stands for the proposition that a chartered city has the power to enact regulations regarding contract formation that differ from those contained in section 40602, something the City has evidently chosen not to do. Simply stated, in *Butterworth,* the court held the

12

general law (state law) could not *preempt* a charter amendment passed by the voters of San Francisco specifically addressing the topic of *city employee* health insurance practices.

### D. Cities Cannot Be Sued Under An Implied Contract Theory

Even if plaintiff is correct that section 40602 does not apply to this case, as explained by the Court of Appeal in *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104 (*Katsura*), "[i]t is settled that 'a private party cannot sue a public entity on an implied-in-law or quasi-contract theory, because such a theory is based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit a public entity's contractual obligations.' [Citations.] [¶] . . . The reason is simple: ' "The law never implies an agreement against its own restrictions and prohibitions, or [expressed differently], 'the law never implies an obligation to do that which it forbids the party to agree to do.' " ' [Citation.] In other words, contracts that disregard applicable code provisions are beyond the power of the city to make." (*Id.* at pp. 109–110.)

The principle set forth in *Katsura*, *supra*, 155 Cal.App.4th 104, is well established (see, e.g., *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824, 830; see also *Seymour v. State of California* (1984) 156 Cal.App.3d 200, 204–205.) Limitations on a municipality's power to contract should be strictly construed because such restrictions are designed to protect the public, not those who contract with the municipality. (10 McQuillin, Municipal Corporations (3d ed. 2009 rev.) § 29:6, p. 336.)

Plaintiff seeks to distinguish *Katsura*, *supra*, 155 Cal.App.4th 104, because the operative charter in that case expressly required all city contracts to be in writing. Plaintiff asserts that if the City had "wanted the benefit of the *Katsura* rule, it could have adopted similar charter language." However, the holding in *Katsura* was that *all* implied contracts against public entities are barred because, by definition, they have not formally

13

been approved by the entity. The court in that case did not limit its holding to cities with charters that expressly require all contracts to be in writing.

In sum, we agree with the City that the demurrer as to the first, second, third and 10th causes of action was properly sustained.

### III. *Proposition 218*

The trial court sustained the City's demurrer to the fourth, fifth, and 11th causes of action, finding them barred under Proposition 218. "Adopted by California voters in November 1996, Proposition 218 added articles XIII C and XIII D to the California Constitution. Proposition 218 generally prohibits local governments from imposing taxes without voter approval." (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 128.) " 'Article XIII C concerns voter approval for local government general taxes and special taxes. Article XIII D sets forth procedures, requirements and voter approval mechanisms for local government assessments, fees and charges.' " (*City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926, 931.)

Plaintiff's fourth cause of action is for "Breach of Duty to Charge a Reasonable Water Rate."[11] In its claim, it asserts the City "breached its obligation to provide water at a reasonable rate" when it passed the 1992, 1995, and 2009 Ordinances in contravention of the Historical Cost Sharing Ratio, causing Class members to pay rates almost five times higher than rates paid by City residents. It claims the Class has suffered damages in excess of $11 million, equal to the difference between what the Class paid under the 2009 Ordinance and what it would have paid had the City "honored the contractual Historic[al] Cost Sharing Ratio." Similarly, the fifth cause of action for breach of fiduciary duty claims that the City owes the Class a duty to treat residents and nonresidents equally with respect to the LWS. The 11th cause of action for declaratory

---

[11] Our research has not uncovered any reported cases in any jurisdiction in the United States identifying this claim as a cause of action.

14

relief alleges that the City presently intends to sell the LWS to a private utility and claims the July 2014 rates "will continue to violate the Historical Cost Sharing Ratio by forcing the non-resident customers of the LWS to pay 100% of the cost of operating, maintaining and improving the LWS."

The trial court found what it referred to as the " 'pooled-rate' structure" proposed by plaintiff in these claims to be prohibited by article XIII D, section 6, subdivision (b) of the California Constitution, which provides that "[a] fee or charge shall not be extended, imposed, or increased by any agency unless it meets all of the following requirements: [¶] (1) Revenues derived from the fee or charge shall not exceed the funds required to provide the property-related service. [¶] (2) Revenues derived from the fee or charge shall not be used for any purpose other than that for which the fee or charge was imposed. [¶] (3) The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership *shall not exceed the proportional cost of the service attributable to the parcel*." (Italics added.) The court cited to *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586 (*Griffith*) in support of its ruling, concluding that Proposition 218 "prohibits a rate structure as alleged in Plaintiff's complaint that requires one group of customers to essentially subsidize another . . . ."

In *Griffith,* the objectors appealed from judgments in favor of a water management agency challenging an ordinance enacted by the agency that increased groundwater augmentation charges for the operation of wells within the agency's jurisdiction. The Court of Appeal held that the augmentation charges were expressly exempt from Proposition 218's fee/charge voting requirement. "Given that Proposition 218 prescribes no particular method for apportioning a fee or charge other than that the amount shall not exceed the proportional cost of the service attributable to the parcel, defendant's method of grouping similar users together for the same augmentation rate and charging the users according to usage is a reasonable way to apportion the cost of service." (*Griffith, supra,* 220 Cal.App.4th at p. 601.)

15

Plaintiff asserts Proposition 218 is irrelevant to this dispute because the complaint does not specify how the City is to satisfy its obligation to pay monetary damages equal to the difference between a "reasonable rate" and the rates the City actually charged members of the putative class. However, the "Historical Cost Sharing Ratio" theory is not viable in light of Proposition 218. Manifestly, an apportionment that would place 98 percent of the burden of LWS on City residents while giving them zero services in return is unreasonable. Plaintiff also briefly asserts it should be granted leave to amend to allege a federal equal protection cause of action. However, the case that it relies on—*Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1189–1190 (*Hansen*)—does not assist plaintiff, as it was decided before the passage of Proposition 218.

## IV.    *Injunctive Relief Against Sale*

Plaintiff's sixth and seventh causes of action are for injunctive relief against the alleged proposed sale of the LWS. The sixth cause of action is against the sale of the system, and the seventh is against the sale of the system without land. The complaint alleges that the City intends to sell the LWS to a private investor-owned utility that would thereafter "be allowed to pass the full cost of operating, maintaining and improving the LWS onto the Class." In the seventh cause of action, plaintiff asserts the city intends to sell the physical structure of the LWS, while retaining the excess real property for the benefit of its general municipal fund without investing any of the proceeds into the LWS.

The trial court concluded that it could not legally prevent the execution of a public sale, noting that both the California Constitution[12] and Public Utilities Code section

---

[12] California Constitution article XI, section 9, subdivision (a) provides: "A municipal corporation may establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation, or means of communication. It may furnish those services outside its boundaries, except within another municipal corporation which furnishes the same service and does not consent."

10051[13] grant the City the power to operate and to sell its public utility assets. (See *Leach v. City of San Marcos* (1989) 213 Cal.App.3d 648, 660–661 ["Under Code of Civil Procedure section 526 . . . and Civil Code section 3423 an injunction cannot be granted to prevent execution of a public statute. Nonetheless an injunction may issue where the statute or ordinance is invalid *and* a showing is made of irreparable injury to property or business."].) Here, plaintiff offers nothing persuasive to show that Public Utilities Code section 10051 is invalid.[14] Accordingly, the two claims for injunctive relief fail.

## V. *Injunctive Relief Against Surcharge Fee and Future Rate Structures*

Plaintiff's eighth cause of action asked for an injunction to stop the City from continuing a surcharge fee enacted as a part of the 1995 Ordinance after September 30, 2015, when it is set to expire. In the ninth cause of action it seeks to stop the City from imposing future rate structures that do not require it to share in the cost of operating and maintaining the LWS pursuant to the Historical Cost Sharing Ratio.

As the trial court correctly found, the speculative allegation that the City may violate the provision that discontinues the surcharge fee after September 30, 2015, was premature. Additionally, the court noted that under *Water Replenishment Dist. of Southern California v. City of Cerritos* (2013) 220 Cal.App.4th 1450, 1469–1470, water assessments are subject to the " 'pay first, litigate later' " rule. Plaintiff challenges this ruling. Regardless, the injunction claims are based on the same implied contract theory that we have already found lacking in merit.

---

[13] Public Utility Code section 10051 provides: "Any municipal corporation incorporated under the laws of this State may as provided in this article sell and dispose of any public utility that it owns."

[14] Plaintiff claims that the sale would violate Public Utilities Code sections 10061 [prohibiting the acquiring entity from unreasonably discriminating against existing customers] and 789.1 [proceeds from sale of public utility land by a "water corporation" must be invested in "necessary or useful" water infrastructure]. The claims are premature, as there are no allegations in the complaint that the City has approved a sale to an identified buyer on known terms.

17

## VI. *Breach of Fiduciary Duty and Accounting*

Plaintiff's fifth cause of action is for breach of fiduciary duty. The 12th cause of action is for accounting. The trial court agreed with the City that the two claims fail because there is no common law tort liability for public entities in California. Instead, liability must be based on statute per section 815, subdivision (a). We agree.

"The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. [Citation.] Whether a fiduciary duty exists is generally a question of law. [Citation.] Whether the defendant breached that duty towards the plaintiff is a question of fact." (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1599.)

It is a well-settled rule that "[t]here is no common law governmental tort liability in California; and except as otherwise provided by statute, there is no liability on the part of a public entity for any act or omission of itself, a public employee, or any other person." (*Cowing v. City of Torrance* (1976) 60 Cal.App.3d 757, 761.) Section 815, subdivision (a) states: "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." The legislative committee comment to section 815 states: "This section *abolishes all common law or judicially declared forms of liability for public entities,* except for such liability as may be required by the state or federal constitution . . . ." (Italics added.)

Plaintiff relies on *South Pasadena v. Pasadena Land Etc. Co.* (1908) 152 Cal. 579, 594 (*South Pasadena*) and other cases stating that a city holding title to a water system outside of its boundaries acts "as a mere trustee, bound to apply it to the use of those beneficially interested." These cases are not controlling, however. For example, in *Hansen, supra,* 42 Cal.3d 1172, the Supreme Court reversed the Court of Appeal and upheld the lower court's ruling that a 70 percent surcharge on nonresident water customers was reasonable. (*Id*. at p. 1176.) That case is distinguishable because it, like

18

*South Pasadena,* at pp. 587–588, is founded on the following principle: "A city *which acquires the water system of another community* incurs an obligation to deal fairly with its customers in that community and to provide them with service at reasonable rates." (*Hansen*, at p. 1180, italics added.)  Here, the City did not acquire the LWS from plaintiff or plaintiff's predecessors.  Again, *Hansen* is also distinguishable because it was decided prior to the passage of Proposition 218.  Additionally, none of the cases cited by plaintiff in this regard discuss section 815, subdivision (a).

Finally, the accounting cause of action seeks an accounting of the surcharge and connection fees levied by the City upon the LWS customers based on the allegation that the fees were not placed in dedicated accounts and were not used exclusively for constructing capital improvements to the LWS, as required by City regulations.

"An accounting is an equitable proceeding which is proper where there is an unliquidated and unascertained amount owing that cannot be determined without an examination of the debits and credits on the books to determine what is due and owing. [Citations.]  Equitable principles govern, and the plaintiff must show the legal remedy is inadequate. . . .  Generally, an underlying fiduciary relationship, such as a partnership, will support an accounting, but the action does not lie merely because the books and records are complex.  [Citations.]  Some underlying misconduct on the part of the defendant must be shown to invoke the right to this equitable remedy." (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1136–1137.)  As we have already concluded plaintiff cannot state any viable claims alleging misconduct on the part of the City, the cause of action for an accounting fails.

19

## VII.    *Trial Court Did Not Abuse Its Discretion in Denying Leave to Amend*

Plaintiff fails to set forth in sufficient detail how it would amend its complaint to correct the multiple defects noted above.  We conclude the trial court did not abuse its discretion in denying plaintiff leave to amend.[15]

## DISPOSITION

The judgment is affirmed.

---

[15] In light of our above conclusions, we need not address the parties' remaining arguments.

_____
DONDERO, J.

We concur:


_____
MARGULIES, Acting P.J.


_____
BANKE, J.

A142808

21

| | |
|---|---|
| Trial Court: | Solano County Superior Court |
| Trial Judge: | Hon. W. Arvid S. Johnson |
| Counsel for Appellant | Law Offices of Stephen M. Flynn<br>　Stephen M. Flynn |
| Counsel for Respondent | Claudia M. Quintana, Vallejo City Attorney; Donna R. Moody, Chief Assistant Vallejo City Attorney<br><br>Colantuono, Highsmith & Whatley, PC<br>　Michael G. Colantuono<br>　Amy C. Sparrow<br>　Leonard P. Aslanian<br>　Jennifer L. Pancake |