Filed 9/15/22

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| CITY OF OAKLAND, | B313388 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV20676) |
| v. | |
| THE OAKLAND RAIDERS, et al. | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig D. Karlan, Judge.  Affirmed.

Barbara Parker, City Attorney (Oakland), and Maria Bee and Malia J. McPherson; Berg & Androphy, Michael Fay, *pro hac vice*; Pearson, Simon & Warshaw, Clifford H. Pearson and Michael H. Pearson for Plaintiff and Appellant.

Arnold & Porter Kaye Scholer, Steven L. Mayer and Daniel B. Asimow for Defendant and Respondent Oakland Raiders.

Covington & Burling and John E. Hall for Defendants and Respondents the National Football League, Arizona Cardinals Football Club LLC, Atlanta Falcons Football Club, LLC,

Baltimore Ravens Limited Partnership, Buffalo Bills, LLC, Panthers Football, LLC, The Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns Football Company LLC, Dallas Cowboys Football Club, Ltd., PDB Sports, Ltd., The Detroit Lions, Inc., Green Bay Packers, Inc., Houston NFL Holdings, LP, Indianapolis Colts, Inc., Jacksonville Jaguars, LLC, Kansas City Chiefs Football Club, Inc., Chargers Football Company, LLC, The Rams Football Company, LLC, Miami Dolphins, Ltd., Minnesota Vikings Football, LLC, New York Football Giants, Inc., New York Jets LLC, Philadelphia Eagles, LLC, Pittsburgh Steelers LLC, Forty Niners Football Company LLC, Football Northwest LLC, Buccaneers Team LLC, Tennessee Football, Inc., Pro-Football, Inc., New England Patriots LLC, New Orleans Louisiana Saints, LLC.

_____

**INTRODUCTION**

This appeal arises out of a lawsuit filed by the City of Oakland against the National Football League (the League or the NFL) and its 32 member clubs (collectively, the defendants) after one member club, the Raiders, relocated from Oakland to Las Vegas. The City alleged the defendants did not comply with the process for approving club relocations set forth in the NFL Constitution and related documents. The City asserted causes of action for breach of contract as a third party beneficiary, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. The trial court sustained the defendants' demurrer to all three causes of action without leave to amend and entered judgment for the defendants.

2

The City argues the trial court erred in ruling it was not a third party beneficiary of the NFL Constitution and related documents and therefore did not have standing to enforce those documents.  The City also argues the court applied an incorrect legal standard in ruling on the demurrer to its cause of action for unjust enrichment.

We conclude that, because the City did not and cannot allege it is a third party beneficiary of the alleged contracts, its causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing fail.  We also conclude the City has not and cannot allege facts sufficient to state a cause of action based on a theory of unjust enrichment.  Therefore, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The League Commissioner Issues a Relocation Policy*

The Raiders football team is a member club of the National Football League, an unincorporated association.  (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 626, 637.)  The NFL Constitution governs the League's operations.  Article 4.1 of the Constitution defines the "home territory" of each club as "the city in which such club is located and for which it holds a franchise and plays its home games and includes the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city," except in circumstances not relevant here.  Article 4.3 precludes any member club from moving its franchise or playing site to a different city "without prior approval by the affirmative vote of three-fourths of the existing member clubs of the League."

3

In 1984 the United States Court of Appeals for the Ninth Circuit held the provision in Article 4.3 imposing a restraint on relocations subjected the League to liability under federal antitrust law when the League rejected the Raiders' proposed move to Los Angeles in 1980. (*Los Angeles Memorial Coliseum Com. v. National Football League* (9th Cir. 1984) 726 F.2d 1381, 1398.)[1] The court stated that Al Davis, then the general manager of the Raiders, suggested in 1978 the League replace its "subjective voting procedure" with "a set of objective guidelines to govern team relocation." (*Id.* at p. 1397.) The court appeared to endorse that suggestion by stating the League, to avoid antitrust liability, might have to adopt "[s]ome sort of procedural mechanism to ensure consideration of" objective factors relevant to relocation decisions. (*Ibid.*)

Soon after the Ninth Circuit's decision in *Los Angeles Memorial Coliseum*, United States Senator Slade Gorton introduced Senate Bill No. 2505, which would have created an independent arbitration board with discretion to deny the proposed relocation of a professional sports franchise based on nine objective factors. (Sen. No. 2505, 98th Cong., 2nd Sess., 130 Cong. Rec. 7076, 23857-23860 (1984).) Those factors included "important community interests" that could be "inconsistent with immediate financial gain" for the owner of a team that wanted to relocate. (*Id.* at pp. 23857-23858.) More specifically, under the

---

[1] The team did relocate to Los Angeles in 1982, after the United States District Court issued an order enjoining the NFL and its member clubs from interfering with the move, before moving back to Oakland in 1995. (See *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 629; *Los Angeles Memorial Coliseum Com. v. National Football League, supra,* 726 F.2d at p. 1386.)

4

proposed legislation the independent board would consider things like existing fan support for the team, the extent of public financial support for playing facilities, and the degree to which the club engaged in good faith negotiations with community leaders over terms and conditions that would allow the club to remain in its home territory. (*Id.* at p. 23858.) The factors reflected the bill's proposed findings, which included that a professional sports team could decide to relocate "without regard to important interests and considerations" of the existing host community and that such communities did not have "adequate protection" against relocations that "are not consistent with the public interest." (*Id.* at pp. 23857-23858.) Members of Congress introduced several other bills around the same time to regulate professional sports franchise relocations, including the Professional Sports Team Community Protection Act proposed by Senator Gorton in 1985, but Congress did not enact any of them.[2]

Perhaps in response to the prospective loss of autonomy and control over relocation decisions, League Commissioner Pete Rozelle issued a policy in December 1984 that established new procedures for proposed transfers from a club's home territory

---

[2] See Stein, *How the Home Team Can Keep from Getting Sacked: A City's Best Defense to Franchise Free Agency in Professional Football* (2003) 5 Tex. Rev. Ent. & Sports L. 1, 12-14; Note, *Consumer Advocacy in the Sports Industry: Recognizing and Enforcing the Legal Rights of Sports Fans* (1998) 21 Hastings Comm. Ent. L.J. 809, 820-822; Note, *The Professional Sports Community Protection Act: Congress' Best Response to Raiders?* (1987) 38 Hastings L.J. 345, 354-371.

(the Relocation Policy).[3]  (See Hearings before Sen. Com. on Commerce, Science, and Transportation on Sen. No. 287, 99th Cong., 1st Sess., at p. 69 (1985).)  The Relocation Policy required a club proposing to transfer its franchise or playing site to a different city to present to the Commissioner the club's position on the nine factors listed in Senate Bill No. 2505 and to state why the club believed its proposed transfer was justified under the factors.  (Hearings before Sen. Com. on Commerce, Science, and Transportation on Sen. No. 287, *supra,* pp. 70-71.)  The policy provided that the Commissioner would evaluate the proposed transfer and report to the full membership and that all member clubs would vote on the proposed transfer under Article 4.3.  (*Ibid.*)  According to Paul Tagliabue, who served as League Commissioner from 1989 to 2006, the member clubs "agreed by contract to be bound by the [L]eague's internal procedures for determining franchise location."  (Hearings before Sen. Com. on the Judiciary on Sen. No. 952, 106th Cong., 1st Sess., at p. 84 (1999).)

     B.    *The League and the United States Conference of Mayors Issue a Joint Statement of Principles, and the League Amends the Relocation Policy*

In 1996 the League and the United States Conference of Mayors[4] issued a draft Joint Statement of Principles (the Joint

---

[3]    Article 8.5 of the NFL Constitution gave the Commissioner authority to "establish policy and procedure in respect to the provisions of the Constitution and Bylaws."

[4]    The Conference of Mayors is "a non-partisan organization of cities with populations of 30,000 or more," each represented by its mayor or other chief elected official.  (*United States Conf. of*

Statement) following "many months" of work to develop "a fair process to consider requests for franchise relocations." (Hearings before Sen. Com. on the Judiciary on Sen. No. 952, *supra*, p. 78.) The Joint Statement followed "a series of team relocations . . . culminating in the November, 1995, announcement that the Cleveland Browns would move to Baltimore." (*Id*. at p. 80.) The Joint Statement acknowledged "stable team-community relations" were "good for fans, good for home cities and good for professional sports." Thus, the Joint Statement provided that "[c]ommunities, teams and the [League] should work together to identify and resolve issues pertaining to team relocations . . . ."

In the Joint Statement, the League acknowledged it "should" maintain rules and procedures for proposed relocations that recognize "both the private interest of team owners to maintain a profitable business and [the] public interest to enjoy the direct and indirect benefits of having a professional sports franchise." The Joint Statement recognized such public interests included a community's "financial, psychological and emotional investment in [a] professional sports team." Thus, the Joint Statement provided, the League "should" make relocation decisions based on "objective criteria that account for the interest of fans, communities, taxpayers and owners."

The Joint Statement identified 10 objective criteria that largely mirrored the criteria listed in the Relocation Policy, but added whether the current community stadium authority opposed the relocation and whether there was an investor willing to buy the club and keep it in the current community. The Joint Statement also required the League to "give fair consideration to

---

*Mayors v. Great-West Life & Annuity Ins. Co.* (D.D.C. 2018) 327 F.Supp.3d 125, 127).

7

the information presented by a community in each of the ten criteria" and to "give the most careful consideration to any proposal from the current home community that [would] preserve the existing relationship in an economically-realistic way." The Joint Statement also stated, however, that "team location is a matter for the League members to determine" and that the "League should have the ability to enforce its own rules."

In 1999 League executive Joe Browne wrote to Mayor Marc Morial of New Orleans, the chairman of the committee of the Conference of Mayors that negotiated the Joint Statement. (Hearings before Sen. Com. on the Judiciary on Sen. No. 952, *supra*, p. 78.) Browne stated that the League amended its "franchise movement guidelines" as a "direct result" of the League's discussions with the Conference of Mayors and that the amended guidelines "balance and protect the interest of the cities, the League and individual teams." (*Ibid.*) Browne also said the amended guidelines established an "orderly process, ensuring municipal interests [would] be heard and addressed," and allowed a club to relocate "only after exhausting all reasonable options in a team's existing home territory." (*Ibid.*) Several days later Mayor Morial wrote to Commissioner Tagliabue and expressed gratitude for the amended franchise movement guidelines, which, according to Mayor Morial, "should give city interests a greater measure of recognition and protection." (*Id.* at p. 79.)[5]

---

[5] The correspondence to and from Mayor Morial referred to the Joint Statement of Principles as a "draft." (Hearings before Sen. Com. on the Judiciary on Sen. No. 952, *supra*, pp. 78-79.) It is unclear from the record when, if ever, the League and the

8

According to Commissioner Tagliabue, the League revised the Relocation Policy "to reflect the specific concerns expressed by the U.S. Conference of Mayors." (Hearings before Sen. Com. on the Judiciary on Sen. No. 952, *supra*, p. 85.) The new Relocation Policy's preamble emphasizes that "each club's primary obligation to the League and to all other member clubs is to advance the interests of the League in its home territory" and that this obligation includes "maximizing fan support, including attendance, in its home territory." The preamble also states: "League traditions disfavor relocations if a club has been well-supported and financially successful and is expected to remain so. Relocation pursuant to Article 4.3 may be available, however if . . . compelling League interests warrant a franchise relocation."

The revised Policy provides that, before the League will consider a proposed transfer, clubs seeking to transfer must "work diligently and in good faith to obtain and to maintain suitable stadium facilities in their home territories." This is because, according to the Policy, "League policy favors stable team-community relations." The Policy, however, does not restrict clubs from discussing a possible relocation or negotiating a proposed lease in a community outside its home territory at any time, nor does it apply to a club that wants to relocate its franchise or playing site to another city within its home territory.

If a club still proposes to transfer locations outside its home territory, the club must provide written notice to the Commissioner, who will give notice to government and business representatives of the current and proposed home territories and

_____

Conference of Mayors formally adopted or finalized the Joint Statement.

9

the stadium authority of the current home territory.  The Relocation Policy refers to these third parties as "'interested parties.'"  The notice must include a statement of reasons in support of the transfer that addresses each of 12 factors listed below.  Interested parties may also submit comments to the League.  After the Commissioner reports to member clubs on the proposed transfer, the clubs vote on the proposal pursuant to Article 4.3.

The Relocation Policy calls the 12 relevant factors the "Factors That May Be Considered In Evaluating The Proposed Transfer" and states that other factors not listed may be relevant in evaluating a proposed transfer.  The Policy directs clubs that want to transfer to address each of the factors and state "why such a move would be justified with reference to these considerations."  The Policy describes the factors as "[g]uidelines" that help member clubs "to organize data and to inform [their] business judgment" on whether to approve a proposed transfer.

The 12 factors in the Relocation Policy are:

"1.     The extent to which the club has satisfied, particularly in the last four years, its principal obligation of effectively representing the [League] and serving the fans in its current community; whether the club has previously relocated and the circumstances of such prior relocation;

2.     The extent to which fan loyalty to and support for the club has been demonstrated during the team's tenure in the current community;

3.     The adequacy of the stadium in which the club played its home games in the previous season; the willingness of the stadium authority or the community to remedy any deficiencies in or to replace such facility, including whether there are

10

legislative or referenda proposals pending to address these issues; and the characteristics of the stadium in the proposed new community;

4.     The extent to which the club, directly or indirectly, received public financial support by means of any publicly financed playing facility, special tax treatment, or any other form of public financial support and the views of the stadium authority (if public) in the current community;

5.     The club's financial performance, particularly whether the club has incurred net operating losses (on an accrual basis of accounting), exclusive of depreciation and amortization, sufficient to threaten the continued financial viability of the club, as well as the club's financial prospects in its current community;

6.     The degree to which the club has engaged in good faith negotiations (and enlisted the League office to assist in such negotiations) with appropriate persons concerning terms and conditions under which the club would remain in its current home territory and afforded that community a reasonable amount of time to address pertinent proposals;

7.     The degree to which the owners or managers of the club have contributed to circumstances which might demonstrate the need for such relocation;

8.     Whether any other member club of the League is located in the community in which the club is currently located;

9.     Whether the club proposes to relocate to a community or region in which no other member club of the League is located; and the demographics of the community to which the team proposes to move;

10.    The degree to which the interests reflected in the League's collectively negotiated contracts and obligations (e.g.,

labor agreements, broadcast agreements) might be advanced or adversely affected by the proposed relocation, either standing alone or considered on a cumulative basis with other completed or proposed relocations;

11.     The effect of the proposed relocation on [League] scheduling patterns, travel requirements, divisional alignments, traditional rivalries, and fan and public perceptions of the [League] and its member clubs; and

12.     Whether the proposed relocation, for example, from a larger to a smaller television market, would adversely affect a current or anticipated League revenue or expense stream (for example, network television) and, if so, the extent to which the club proposing to transfer is prepared to remedy that adverse effect."

If League membership approves a proposal to relocate a club, the relocating club generally pays a "transfer fee" to the League to compensate other member clubs "for the loss of the opportunity appropriated by the relocating club and/or the enhancement (if any) in the value of the franchise resulting from the move." Member clubs determine the amount of the fee, or a binding method for determining the amount of the fee, at the time they approve a club's relocation.

C.     *The City Files This Action, and the Trial Court Sustains the Defendants' Demurrer Without Leave To Amend*

The Raiders played home games at the Oakland-Alameda County Coliseum from 1995 until the team moved to Las Vegas following a vote of member clubs in 2017. According to the City, the Raiders were financially successful in Oakland, received

12

significant support from the City, and had one of the most loyal fan bases in the League.  The Raiders renewed the team's lease to play games at the Coliseum in 2014, but team executive Mark Davis announced his intention to move the team to Las Vegas that same year.  Davis simultaneously negotiated competing stadium deals with Las Vegas and Oakland.  The State of Nevada offered $750 million in public funds toward a $1.9 billion stadium in Las Vegas, while Oakland pledged $350 million in public funds as part of a $1.3 billion public-private venture to replace the aging Coliseum with a new stadium.  The City alleged Davis never took its proposal seriously and negotiated in bad faith.

In 2017 the Raiders submitted a proposal with the League to relocate to Las Vegas.  The City alleged member clubs "went through the motions" of voting on the proposal, which the membership approved 31 to 1.  According to the City, the value of the Raiders franchise increased by $1.6 billion, and the Raiders paid the League a relocation fee of $378 million.  Meanwhile, the City claimed it lost the value of its investments in the Coliseum that were associated with the Raiders' presence in Oakland, income from ticket sales and the Coliseum lease, and tax revenues associated with Raiders games.

The City sued the League and its member clubs alleging three causes of action.  First, the City alleged the defendants breached the NFL Constitution and the Relocation Policy by failing to "'work diligently and *in good faith* to obtain and to maintain suitable stadium facilities'" in Oakland and to consider the 12 factors listed in the Relocation Policy before approving the Raiders' relocation.  The City alleged it had standing to sue for breach of contract as a third party beneficiary of those alleged agreements.  Second, the City alleged the defendants breached

13

the implied covenant of good faith and fair dealing by failing to consider the 12 factors listed in the Relocation Policy before approving the Raiders' relocation or by considering them in bad faith. The City also alleged all 12 factors "supported the Raiders' continued presence in Oakland." Third, the City alleged the defendants were unjustly enriched to the City's detriment.

The defendants demurred to all three causes of action. For the cause of action for breach of contract, the defendants argued that the Relocation Policy did not contain binding promises and that the City did not sufficiently allege any breach of a binding promise or recoverable damages. For the cause of action for breach of the implied covenant of good faith and fair dealing, the defendants argued that the Relocation Policy allowed member clubs to consider "none, some, or all" of the relocation factors and that a party cannot breach the covenant of good faith and fair dealing by engaging in conduct the agreement permits. The defendants also argued that the City was not a third party beneficiary of the Relocation Policy and that therefore the City did not have standing to allege causes of action for breach of contract or breach of the implied covenant of good faith and fair dealing. Finally, the defendants argued the City could not state a cause of action for unjust enrichment because there is no such cause of action in California and because a lease agreement between the City and the Raiders defined the rights of the parties.

The trial court sustained the demurrer without leave to amend. The court ruled that "the Relocation Policy does not contain a promise that Defendants will consider anything" and that the promise to negotiate in good faith "is belied by the language" that makes compliance with that obligation no more

14

than another optional factor clubs may consider. The trial court stated that the Relocation Policy's 12 factors "simply inform the [member] clubs' judgment in evaluating a proposed relocation" and that "there is no affirmative promise or duty to consider those factors."

The trial court also agreed with the defendants that, even if the Relocation Policy contained enforceable promises, the City could not enforce them because it is not a third party beneficiary of the Relocation Policy. The trial court stated that "the NFL Constitution and Relocation Policy make clear that the purpose behind these documents is to protect and benefit [the League] and the [member] clubs; there is simply no reading of the purported agreements which would allow the trier of fact to conclude that a motivating purpose of the [League] and its member clubs in entering into the Relocation Policy was to provide a benefit to host cities such as Oakland." The court also concluded the purpose of the Relocation Policy was to ensure the League maintained control of its business and to prevent government oversight. Therefore, the court ruled, it would be "illogical" for the League and its member clubs to implement a policy "intending to benefit host cities like Oakland, thereby permitting the very government intervention the Relocation Policy sought to avoid. . . ."

The trial court sustained the demurrer to the cause of action for breach of the implied covenant of good faith and fair dealing as "superfluous," stating the City alleged the same "acts and seek[s] the same damages sought in the first cause of action for breach of contract." The court also stated that a cause of action for breach of the implied covenant of good faith and fair dealing requires an enforceable contract. Because there was no

contractual relationship between the City and the defendants, the court ruled, there could be no breach of the implied covenant. Finally, the trial court sustained the demurrer to the cause of action for unjust enrichment, ruling that California does not recognize such a cause of action and that, even if it did, the City never "conferred a benefit" on the defendants that the defendants retained unjustly.

The court entered judgment in favor of the defendants. The City timely appealed.

## DISCUSSION

A. *Standard of Review*

A demurrer tests the legal sufficiency of the complaint. (*City of Coronado v. San Diego Assn. of Governments* (2022) 80 Cal.App.5th 21, 35.) "In an appeal from a judgment following an order sustaining a demurrer without leave to amend, we first review de novo 'whether the complaint states facts sufficient to constitute a cause of action.'" (*Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 419; see *Schmier v. City of Berkeley* (2022) 76 Cal.App.5th 549, 553, fn. 4.) "'"[W]e accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. We also consider matters that may be judicially noticed."'" (*City of Coronado*, at p. 35; see *Schmier*, at p. 553, fn. 4.)

If the complaint does not allege facts sufficient to constitute a cause of action, we determine whether there is a reasonable possibility the plaintiff can cure the defect by amendment. If so, the trial court has abused its discretion, and we reverse; if not, we affirm. (*City of Coronado v. San Diego Assn. of Governments*,

16

*supra*, 80 Cal.App.5th at p. 35; *All of US or None–Riverside Chapter v. Hamrick* (2021) 64 Cal.App.5th 751, 763.)  The plaintiff has the burden to show a reasonable possibility it can amend the complaint to state a cause of action.  (*City of Coronado*, at p. 35; *Hamrick*, at p. 763.)

B.   *The City Is Not a Third Party Beneficiary of the Relocation Policy*

Civil Code section 1559 provides "a contract, made expressly for the benefit of a third person, may be enforced by him [or her] at any time before the parties thereto rescind it."  In *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817 (*Goonewardene*) the Supreme Court established a three-part test to determine whether an individual or entity that is not a party to a contract may bring a breach of contract action against a party to the contract as a third party beneficiary.  (*Id.* at p. 821.)  That test requires the third party to establish "not only (1) that it is likely to benefit from the contract, but also (2) that a motivating purpose of the contracting parties is to provide a benefit to the third party, and further (3) that permitting the third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties."  (*Ibid*.; see *Wexler v. California Fair Plan Assn.* (2021) 63 Cal.App.5th 55, 65 (*Wexler*).)  "All three elements must be satisfied to permit the third party action to go forward."  (*Goonewardene*, at p. 830.)

In applying this test, the court may look to "the express provisions of the contract at issue, as well as all of the relevant circumstances under which the contract was agreed to."  (*Goonewardene*, *supra*, 6 Cal.5th at p. 830; see *Garcia v. Truck*

17

*Ins. Exchange* (1984) 36 Cal.3d 426, 437 [considering evidence of the circumstances and negotiations of the parties to a contract to determine whether the parties intended the plaintiff to benefit from the contract]; *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 349 [same].)  In general, courts resolve doubts against the existence of a third party beneficiary.  (*Wexler*, *supra*, 63 Cal.App.5th at p. 66; *Shaolian v. Safeco Ins. Co.* (1999) 71 Cal.App.4th 268, 275.)

The parties agree the City "is likely to benefit from" the Relocation Policy and thus meets the first element of the *Goonewardene* test.  The issues are whether the City has alleged sufficient facts to meet the second and third elements of that test and, if not, whether there is a reasonable possibility the City can cure the defect.

### 1. *The City Sufficiently Alleged the Second Element of the* Goonewardene *Test*

To qualify as a third party beneficiary of a contract, "the contracting parties must have a motivating purpose to benefit the third party, and not simply knowledge that a benefit to the third party may follow from the contract."  (*Goonewardene, supra*, 6 Cal.5th at p. 830.)  The Supreme Court in *Goonewardene* acknowledged that past cases sometimes referred to this element as a requirement that "the 'purpose' of the contract be to benefit the third party [citation] and sometimes as a requirement that there be 'an intent to benefit' the third party [citations]."  (*Ibid.*)  Finding the term "intent" ambiguous and potentially confusing, the Supreme Court instead used the term "motivating purpose," but made clear its earlier "intent-to-benefit case law" remained relevant in analyzing the second element of the test for a third

18

party beneficiary. (*Ibid.*; see *Levy v. Only Cremations for Pets, Inc.* (2020) 57 Cal.App.5th 203, 212.)

The City alleged the League Commissioner issued the Relocation Policy after host cities and members of Congress criticized the League for "ignoring the interests of fans and Host Cities in the name of extracting profits."[6] The City also alleged the League revised the Relocation Policy in light of discussions with the United States Conference of Mayors to "'give city interests a greater measure of recognition and protection.'" Indeed, in a congressional hearing cited in the complaint, Commissioner Tagliabue stated the League had "worked for several years with the U.S. Conference of Mayors and come to an understanding on issues of franchise movement." (Hearings before Sen. Com. on the Judiciary on Sen. No. 952, *supra*, p. 78.) That understanding, as reflected in the Joint Statement, intended to benefit host cities and was a motivating purpose for the amendments to the Relocation Policy containing the provisions the City alleges the defendants breached.

The defendants argue the terms of the Relocation Policy make clear that the purpose of the Relocation Policy "is to protect and benefit the [League] and [League] clubs" and that its "overriding motivation" is the League's business interests. That may be. But the Supreme Court in *Goonewardene* did not require a plaintiff to demonstrate the "overriding motivation" of a contract was to benefit the plaintiff; instead, the plaintiff need only show (or here, allege) "a motivating purpose" was to provide

---

[6] The defendants claim the City invented the term "Host Cities," which does not appear in the Relocation Policy, to support the City's claim the Relocation Policy was intended to benefit cities in which member clubs play their games.

19

a benefit to the plaintiff. (*Goonewardene, supra,* 6 Cal.5th at p. 830.)[7] The City cleared that pleading hurdle. In particular, the League's adoption of the revised Relocation Policy following the Joint Statement with the United States Conference of Mayors shows "a motivating purpose" of the new Policy was to provide a benefit to cities that host member clubs. There may have been other motivations for the League to adopt the revised Relocation Policy, such as avoiding antitrust liability and protecting the League's business interests, but those motivations do not exclude the possibility of additional motivating purposes.

The defendants also argue that the contracting parties' intent to benefit a third party "'must appear in the terms of the agreement'" (*Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1486; see *Allied Anesthesia Medical Group v. Inland Empire Health Plan* (2022)

---

[7] The defendants cite the decision of the United States District Court for the Northern District of California in *City of Oakland v. Oakland Raiders* (N.D.Cal. July 25, 2019, No. 18-cv-07444-JCS) [2019 WL 3344624], which granted a motion by the League and its member clubs to dismiss the City's breach of contract cause of action in that case because the City was not a third party beneficiary of the Relocation Policy under California law. (*Id.* at p. 16.) In so doing, the court ruled the "overriding motivation" of the League and its member clubs in adopting the Relocation Policy was to further the League's "business interests." (*Id.* at p. 14.) Decisions of a federal court interpreting California law "are only authoritative to the extent we find them persuasive." (*LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, 371.) The decision of the district court in *City of Oakland v. Oakland Raiders* is not persuasive; it imposed a higher burden on the plaintiff than the burden imposed by the California Supreme Court in *Goonewardene*.

80 Cal.App.5th 794, 806) and that the Relocation Policy "says nothing about furthering the interests of cities in which clubs are located." But the cases the defendants cite contradict the Supreme Court's decision in *Goonewardene*, which plainly states a court, in applying its three-part test, should carefully examine the terms of the contract "as well as" the circumstances under which the contract was negotiated. (*Goonewardene, supra,* 6 Cal.5th at p. 830; see *Garcia v. Truck Ins. Exchange, supra,* 36 Cal.3d at p. 437 ["In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible."]; *Martinez v. Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 401 [a third party may enforce a contract if such an intention appears from "the nature of the contract and the circumstances accompanying its execution"]; *Lucas v. Hamm* (1961) 56 Cal.2d 583, 590-591 [rejecting any requirement that "there must be 'an intent clearly manifested by the promisor' to secure some benefit to the third person"]; *Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949, 957-958 [citing *Lucas* and considering the circumstances under which the contracting parties negotiated in determining if the plaintiff was a third party beneficiary of the contract].)

> 2. *The City Did Not and Cannot Plead Facts To Satisfy the Third Element of the* Goonewardene *Test*

The third element of the *Goonewardene* test "does not focus upon whether the parties specifically intended third party enforcement but rather upon whether, taking into account the

21

language of the contract and all of the relevant circumstances under which the contract was entered into, permitting the third party to bring the proposed breach of contract action would be 'consistent with the objectives of the contract and the reasonable expectations of the contracting parties.' [Citation.]  In other words, this element calls for a judgment regarding the potential effect that permitting third party enforcement would have on the parties' contracting goals, rather than a determination whether the parties actually anticipated third party enforcement at the time the contract was entered into."  (*Goonewardene, supra,* 6 Cal.5th at pp. 830-831.)

"Furthermore, the requirement in the third element that third party enforcement be consistent with 'the objectives of the contract' is comparable to the inquiry . . . whether third party enforcement will effectuate '"the contracting parties' performance objectives,"' namely 'those objectives of the enterprise embodied in the contract, read in the light of surrounding circumstances.'"  (*Goonewardene, supra,* 6 Cal.5th at p. 831, italics omitted; see, e.g., *Wexler, supra,* 63 Cal.App.5th at p. 66 [insureds' daughter was not a third party beneficiary where permitting her to enforce the insurance contract was not necessary "to effectuate the insurance contract's objectives"].)  "And the additional requirement in this element that third party enforcement be consistent as well with 'the reasonable expectations of the contracting parties' reflects the teaching of prior California decisions that have denied application of the third party beneficiary doctrine when permitting the third party to maintain a breach of contract action would not be consistent with the reasonable expectations of the contracting parties."  (*Goonewardene,* at p. 831.)

Even if the Relocation Policy's benefits to host cities such as Oakland could only be realized by giving host cities the right to enforce the Policy, such a result would not be consistent with the reasonable expectations of the parties under the language of the Policy and the relevant circumstances surrounding its adoption. First, the language of the Relocation Policy does not preclude a member club from relocating under any set of circumstances, nor does it restrict a member club from exercising its business judgment in any particular way. Simply put, the defendants did not agree to constrain their ability to approve a proposed relocation for any reason. Moreover, the Policy states that, "[i]n considering a proposed relocation, the Member Clubs are making a business judgment concerning *how best to advance their collective interests*." Giving a third party the right to enforce provisions of the Relocation Policy in an attempt to restrict the defendants' unfettered discretion under the Policy and prioritize a third party's interests over the collective interests of the League and its member clubs would be contrary to the Policy's plain language. (See *Martinez v. Socoma Companies, Inc.*, *supra*, 11 Cal.3d at p. 402 [giving a third party a right to enforce a contract contradicted the contract provisions that evidenced the parties' intent to maintain control over the determination of contractual disputes].)

Second, the circumstances surrounding the adoption of the Relocation Policy and its amendments confirm the defendants did not reasonably expect host cities like Oakland to be able to enforce the Policy. As the City alleged, the League first issued the Relocation Policy on the heels of proposed federal legislation that would have removed the League's autonomy in making relocation decisions. The League made amendments to the

23

Relocation Policy under similar circumstances and after fallout from several relocations prompted discussions with the United States Conference of Mayors.  While these circumstances indicate the defendants intended the Relocation Policy to benefit host cities, it does not follow that the defendants reasonably expected host cities to be able to enforce the Policy.  (See *Goonewardene*, *supra*, 6 Cal.5th at p. 836 ["'There is an important analytical distinction between contracting for a benefit to an outsider and granting a right to sue for breach to that outsider.'"], parenthetically quoting Geis, *Broadcast Contracting* (2012) 106 Nw.U.L.Rev. 1153, 1195.)  Indeed, the City conceded in the trial court and in this appeal that "the relevant circumstances demonstrate that [the defendants] adopted the Relocation [Policy] to avoid government intervention and retain control over relocation decisions."  That position is fundamentally inconsistent with the argument the defendants reasonably expected host cities to be able to enforce the Relocation Policy.  If, as the City and the defendants appear to agree, the defendants adopted the Relocation Policy to maintain control over relocation decisions, the defendants would not reasonably expect a host city to be able to sue them over those decisions.

Because the City cannot satisfy the third element of the *Goonewardene* test, the city is not a third party beneficiary of the Relocation Policy and cannot maintain a cause of action for breach of contract.  Nor is there a reasonable possibility the City can amend its complaint to satisfy the *Goonewardene* test.  Both the plain language of the Relocation Policy and the circumstances in which the defendants adopted it support only one conclusion: The defendants did not intend or reasonably expect host cities like Oakland to enforce the Policy.  Therefore, the trial court did

24

not abuse its discretion in sustaining the defendants' demurrer to the City's cause of action for breach of contract without leave to amend. And because the City is not a third party beneficiary of the Relocation Policy, it cannot maintain a cause of action for breach of the implied covenant of good faith and fair dealing. (See *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 433 ["[t]he prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract"]; *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 712 ["The covenant does not exist independently of the underlying contract."].)

C.  *The City Cannot Allege Facts Sufficient To State a Cause of Action Based on a Theory of Unjust Enrichment*

The City argues the trial court applied the wrong legal standard in analyzing whether the City stated a cause of action for unjust enrichment. The City is correct: The trial court did commit legal error. The error, however, was harmless. The trial court properly sustained the defendants' demurrer to this cause of action, albeit for the wrong reason.

1.  *Applicable Law*

There is no cause of action in California labeled "unjust enrichment." (*De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 870; *Bank of New York Mellon v. Citibank, N.A.* (2017) 8 Cal.App.5th 935, 955.) But "[c]ommon law principles of restitution require a party to return a benefit when

25

the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'" (*Munoz v. MacMillan* (2011) 195 Cal.App.4th 648, 661; see *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 ["Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another."]; *Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal.App.5th 230, 238 ["The elements of a cause of action [based on] unjust enrichment are simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of another.'"].) "Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an *obligation* (not a true contract [citation]) created by the law without regard to the intention of the parties . . . .'" (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 346; accord, *Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 639; see 1 Witkin, Summary of Cal. Law (11th ed. 2022) Contracts, § 1050 ["Where a person obtains a benefit that he or she may not justly retain, the person is unjustly enriched."].)

The equitable doctrine of unjust enrichment "is based on the idea that 'one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.'" (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542.) "Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the

defendant to restore plaintiff to his or her original position." (*Ibid.*) "To confer a benefit," however, "it is not essential that money be paid directly to the recipient by the party seeking restitution." (*Hirsch v. Bank of America* (2003) 107 Cal.App.4th 708, 722; accord, *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1278; see 1 Witkin, *supra*, § 1055 ["For a benefit to be conferred, it is not essential that money be paid directly to the recipient by the party seeking restitution."].) When a person has received a benefit from another, he or she is required to make restitution "'only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him [or her] to retain it.'" (*Ghirardo v. Antonioli, supra*, 14 Cal.4th at p. 51; see *California Medical Assn., Inc. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 171, fn. 23.)

The City alleged the defendants were unjustly enriched by the increased value of the Raiders following the club's move to Las Vegas and by the relocation fee, which the Raiders paid to the League. It is questionable whether this is a valid unjust enrichment theory where, as here, the plaintiff is asserting a quasi-contract action to enforce rights created by a contract to which the plaintiff is not a third party beneficiary. (See *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 134 [rejecting an unjust enrichment theory of recovery that was "wholly derivative of the third-party beneficiary claim" because "a court of equity . . . cannot create new rights under the guise of doing equity"]; see also *Feingold v. John Hancock Life Ins. Co. (USA)* (1st Cir. 2014) 753 F.3d 55, 61 [plaintiff could not "circumvent the strong presumption against

27

third-party beneficiaries . . . by recasting an alleged violation of the [contract] as a common law claim" for unjust enrichment].)

But even if such a theory is valid, it would not apply to the City's claim. As the Restatement explains, where someone other than the plaintiff provided the benefit the defendants allegedly unjustly retained, as between the plaintiff and the defendant, the plaintiff is entitled to restitution from the defendant where the plaintiff "has a better legal or equitable right." (Rest.3d Restitution and Unjust Enrichment, § 48.) The Restatement cautions that the requirement the plaintiff "demonstrate 'a better legal or equitable right' to the benefit in question is actually highly restrictive." (*Id.*, com. i, p. 159.) The plaintiff must "identify a right in the disputed assets that is both recognized, and accorded priority over the interest of the defendant, under the law of the jurisdiction. Proof merely that the defendant has received a windfall, that the [plaintiff] has been ill-treated, and that the third party's payment to the defendant (or the defendant's retention of payment as against the [plaintiff]) violates rules of good faith, basic fairness, or common decency, does not suffice to make out a claim in restitution." (*Ibid.*; see *Ghirardo v. Antonioli*, *supra*, 14 Cal.4th at p. 51 [relying on the Restatement of Restitution definition of unjust enrichment]*; American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1486, fn. 23 [California courts apply principles in the Restatement Third of Restitution and Unjust Enrichment]; see also *Canfield v. Security-First Nat. Bank* (1939) 13 Cal.2d 1, 30-31 [although the Restatement "does not constitute a binding authority, considering the circumstances under which it has been drafted, and its purposes, in the absence of a contrary statute or decision in this state, it is entitled to great

28

consideration as an argumentative authority"]; *Karapetian v. Carolan* (1948) 83 Cal.App.2d 344, 349 ["[t]here can be no doubt that the rules announced in the Restatement are sound, and reach the fair and equitable result"].)

2. *The City Does Not Have a Better Legal or Equitable Right in the Increased Value of the Raiders or the Relocation Fee*

In ruling the City could not state a cause of action supporting restitution because the City did not confer a benefit on the Raiders or the League, the trial court applied the wrong standard. As discussed, the plaintiff need not confer a benefit on the defendant to maintain a cause of action based on unjust enrichment. The trial court's error, however, was harmless because the City cannot show that, as between it and the defendants, the City has a better legal or equitable right to the increased value in the Raiders or to the relocation fee. (See Rest.3d Restitution and Unjust Enrichment, § 48.)

As stated, the City bases its right to the Raiders' increased value and to the relocation fee on the defendants' alleged breaches of the Relocation Policy, namely, their failure "to work diligently and in good faith to obtain and to maintain suitable stadium facilities in their home territories" and to consider the factors identified in the Relocation Policy. But even if the defendants failed to comply with these provisions of the Relocation Policy, member clubs could still approve the Raiders' move to Las Vegas. As discussed, and contrary to Oakland's assertions, the Relocation Policy does not prevent member clubs from approving a relocation for any reason. While the Relocation Policy says the League disfavors relocations if a host city has

29

supported the club and the club is financially successful, the Policy still allows for relocation if warranted by undefined "compelling League interests." And while the Relocation Policy does require clubs to work diligently and in good faith to maintain suitable stadium facilities in their home territories, the Policy also allows clubs to "discuss a possible relocation, or to negotiate a proposed lease or other arrangements, with a community outside its home territory." Finally, as the defendants argue, nothing in the Policy obligates member clubs to (or says how they should) weigh the relocation factors in determining how to vote on a proposed relocation. The factors are merely "useful ways to organize data and to inform" each club's judgment about whether a proposed transfer advances the clubs' collective interests. Thus, even if the Raiders failed to work diligently and in good faith to maintain suitable stadium facilities in Oakland, and even if no club considered a single relocation factor in voting to approve the Raiders' move to Las Vegas (including the degree to which the Raiders engaged in good faith negotiations concerning terms and conditions under which the club could remain in Oakland and afforded the community a reasonable amount of time to address pertinent proposals), the City would not have a legal claim to the benefits the defendants received when the Raiders moved to Las Vegas. Because there is no possibility the City can amend the complaint to allege it has a better legal or equitable right to the increased value of the Raiders or to the relocation fee under the Relocation Policy, the trial court did not abuse its discretion in sustaining the defendants' demurrer to the cause of action for unjust enrichment without leave to amend.

## DISPOSITION

The judgment is affirmed.  The defendants are to recover their costs on appeal.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.