Filed 12/17/25  Varga v. Lomas Serenas Property Owners Assn. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| TIBOR VARGA et al., | D082364, D083174 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2018-00016786-CU-NP-NC) |
| LOMAS SERENAS PROPERTY OWNERS ASSOCIATION et al., | |
| Defendants and Appellants. | |

CONSOLIDATED APPEALS from a judgment and postjudgment order of the Superior Court of San Diego County, Cynthia A. Freeland, Judge. Affirmed.

Berding & Weil, Anne L. Rauch, Trinette Sachrison and Paul W. Windust for Defendants and Appellants.

Palomar Law Group, Randolph W. Ortlieb and Andre Didier; Williams Iagmin and Jon R. Williams for Plaintiffs and Respondents.

Defendants Lomas Serenas Property Owners Association (Association), a California nonprofit corporation, and board members Anthony Ditty and Thomas Demere (sometimes collectively, Defendants) appeal from a judgment and postjudgment order in favor of plaintiffs Tibor Varga and Ligia

Varga, husband and wife (sometimes collectively, the Vargas). In a bifurcated trial, the jury found (1) the Association breached its fiduciary duty to the Vargas when it failed to lift a cease and desist order (CDO or Order) its board imposed during the Vargas's construction of, and when it took additional disciplinary action against them in connection with, their home improvement project (Project), awarding Tibor and Ligia each $100,000 in noneconomic damages; (2) Ditty and Demere individually liable for their own breaches of fiduciary duty as board members, awarding Tibor and Ligia each $2,500 against both Ditty and Demere; and (3) during a duly noticed Board meeting, Ditty committed a civil assault against Tibor, awarding him damages of $2,500.[1]

Following the jury trial, the trial court conducted a bench trial on the parties' equitable claims and defenses. In its 20-page final statement of decision (SOD), the court (1) rejected the Association's affirmative defense of equitable estoppel and its claim that deference should be given to its decision to keep the CDO in place through the time of trial; and (2) declared the CDO was no longer in force or effect. It subsequently awarded the Vargas attorney fees and costs and entered judgment accordingly.

In a postjudgment order,[2] the court granted the Vargas's motion requiring the Association to levy a special emergency assessment on its members to pay the money portion of the judgment, after finding the Association did not have sufficient executable assets. The court, however,

---

[1]   The jury found Demere not liable to Tibor for civil assault and battery.

[2]   In February 2024, we construed the parties' stipulation to consolidate case Nos. D082364 (appeal from the judgment) and D083174 (appeal from the postjudgment order) as a motion to consolidate and granted that request.

stayed enforcement of that order until the Association exhausts its appellate rights.

On appeal, Defendants contend the trial court erred when it (1) ruled they each owed a fiduciary duty to the Vargas; (2) refused to defer to the decision of the Association and its Board to keep the CDO in place and, like the jury in this case, found their doing so was unreasonable; and (3) rejected Defendants' posttrial arguments that Ligia's breach of fiduciary cause of action was time-barred under the applicable statute of limitations. Ditty alone contends (4) there is insufficient evidence to support the jury's finding he "threaten[ed] to touch Tibor . . . in a harmful or an offensive manner" for purposes of civil assault. Finally, Defendants contend the court abused its discretion when it (5) ordered the Association to levy a special assessment on its members to pay the money judgment.

As we explain, we reject each of these contentions and affirm the judgment and the postjudgment order.

FACTUAL AND PROCEDURAL BACKGROUND[3]

A. *The Lomas Serenas Property Owners Association*

The Association is a nonprofit corporation operating a common interest development located in the City of Escondido (City), County of San Diego, consisting of the residential properties within the Association's boundaries. It is governed by a five-person Board who are members of the Association elected by the community at large. All of the lots within the development are subject to the recorded Restatement of Declaration of Restrictions (CC&Rs).

---

[3]    We summarize the facts in the light most favorable to the judgment and postjudgment order,  drawing all reasonable inferences and resolving all conflicts in favor of the Vargas. (See *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 522, fn. 1.)

3

As owners of a home located within the Association, the Vargas were subject to the CC&Rs and the Board's directives.

The CC&Rs require all owners within the development to submit plans and specifications for home improvement projects to the Association's three-member architectural review committee (ARC) for review and final approval before performing any of the proposed improvements. The ARC's approval does not relieve an owner "from complying with any requirements of any public authority having jurisdiction and shall not constitute any representation or guarantee by the ARC . . . that a building permit will be issued therefor by the City."

B. *The Vargas's Project*

In 2002, the Vargas submitted plans to the ARC for a substantial remodel of their home. The ARC approved the plans in early 2003. The Vargas's next-door neighbor, O.W., appealed the approval of the Project, claiming it interfered with his view. Although the Board rejected O.W.'s appeal, the Vargas postponed the Project for other reasons.

In 2009, the Vargas sought "reapproval" of their Project, modifying their previous plans. In August 2009, the ARC approved the revised plans, reiterated its approval did not supersede the City's building codes, and recommended the Vargas contact the City's planning department to determine whether any permits were required. The Vargas hired a structural engineer and architect, and submitted modified plans to the City for a proposed addition that included a new garage, pool, driveway, and deck. In February/March 2011, various departments of the City approved the revised plans and issued permits for the Project. The Vargas began construction in early September that same year.

4

On September 28, 2011, the Association sent the Vargas a notice to cease and desist construction, pending verification it was complying with the Project approved by the ARC in 2009.  In response, Tibor met with the Association's property manager, Prescott Management, a day or two later and resolved the issue.

C.  *Revision 1 Plans*

In May 2012, the Vargas submitted a revised set of grading plans (Revision 1 Plans) to the City and the ARC.  The Revision 1 Plans differed from the previously approved plans in that they added a retaining wall that "could be filled" with water, creating a "pond" or "reflecting pond," and a seven-foot-wide paved trail that ran from the top to the bottom of their property, where it abutted an easement road; eliminated the previously contemplated pool, which would have required a separate permit; and included a legend showing where they intended to pour hardscape.

The ARC approved the Revision 1 Plans in May 2012, noting they reflected "changed field conditions due to rocks encountered on site."  In the review and approval process, the ARC did not raise any concerns about the proposed access trail shown on the plans, or the reduced scope of the courtyard and retaining-wall system in lieu of a pool.  The City approved the Revision 1 Plans in July 2012.

The Vargas's construction continued in 2013, despite ongoing opposition by neighbor O.W.  In October 2013, Prescott Management asked the Vargas to update the status of their Project, which it then would pass on to the Vargas's neighbors.  In March 2014, the Board asked the Vargas to submit a notice of completion of construction items and provide a landscape restoration plan with a timeline for completion.  That same month, the Vargas submitted an updated home improvement application, setting

5

August 30, 2014, as the estimated completion date for construction. In the updated application regarding tasks to be completed, the Vargas referenced the "rain pond," the "courtyard rain pond," and retaining walls as part of that pond, about 13 times; the backyard grading and hardscape; and landscape restoration.

D. *The CDO*

In early June 2014, the Vargas were set to pour concrete for the access trail in their backyard. Demere saw the concrete forms and alerted Board president Dick Flanagan just prior to the pour. The Board in response instructed Prescott Management to mail the CDO to the Vargas, believing the Vargas were constructing an unapproved concrete "driveway" from the front to the back of their property.

The Vargas began pouring concrete on the morning of June 11, in what was scheduled to be a two-day pour. A City inspector was present and made only one comment to Tibor regarding a fence for erosion control, which had been inadvertently knocked down during construction. That evening, Ligia told Tibor that someone, presumably from Prescott Management, had left a voicemail message earlier in the day stating they were to stop all work on their "driveway" and that they would receive written notice of the stoppage in the mail. Tibor promptly returned the call and left a message that a City inspector had been onsite and witnessed the pour; and that construction was proceeding in accordance with the approved Revision 1 Plans.

In the afternoon of June 12, the Vargas received the CDO notice with their regular mail delivery. Neither the Board nor Prescott Management communicated with the Vargas on June 12, despite Tibor's message. The CDO instructed the Vargas to stop all work on the "driveway leading from the back of [their] property to the easement road that was not included in

6

[their] original Architectural Application"; and requested they either personally appear at, or submit written documentation in advance of, the upcoming July 9 Board meeting.

The Vargas were "very anxious" about having to wait until July 9 to address the Board because their building permit was to expire on August 30, 2014. According to Tibor, if construction was not completed by that date, they would have to restart the entire permitting and approval process. In addition, the Vargas were concerned about stopping work without having proper erosion control in place, and felt pressured by the Association to "finish the job." As a result, Tibor e-mailed the Association on June 13, explaining they were not constructing a driveway but only a walkway, which was in accordance with their approved Revision 1 Plans. He also attempted to resolve the matter more expeditiously by contacting the Board members directly, but was advised he needed to wait until the July 9 meeting.

On July 1, City inspector Hector Favela e-mailed Flanagan, stating the "concrete pathway" in the Vargas's backyard was "not considered a code violation," as it allowed the Vargas "to reach the lower portion of their residence for maintenance and personal use." Favela's e-mail was in response to Flanagan's inquiry whether the City considered the "concrete pathway" to be a "trail," as indicated on the Revision 1 Plans.

E. *The July 9 Meeting and Appointment of an Executive Committee*

Tibor appeared at the meeting and asked the Board to prepare an "attendance sheet" because he was unfamiliar with some of its newer members. The Board refused; it also refused to give him the Board minutes, identify its members by name, and allow him to photograph the Board. According to Tibor, the meeting "started out on a bad foot."

7

During the meeting, the Board requested more detail about the concrete "driveway," including its width; and asked the Vargas to provide a color-coded plan showing the improvements they already had built. Less than a week later, the Vargas complied with that request.

On July 17, 2014, the Vargas received the Board's response thanking Tibor for attending the July 9 meeting and "submit[ing] much, if not all of the requested documentation" it originally sought. The Board, however, requested additional information from the Vargas, including a full-sized set of " 'as built' " plans highlighting any changes they had made from their previous plans, as well as digital photo files showing when they had poured the concrete for the access trail.

The Board subsequently appointed President Flanagan and Vice President Ditty to a two-board committee to further investigate the Vargas's construction. On July 27, they spent about an hour at the Vargas's property. In addition to the access trail, they questioned whether the Revised 1 Plans included portions of the hardscape and the "pond."

On July 29, Flanagan informed the Vargas he had spent about three hours that day at the City reviewing the Vargas's plans and "conducting discussions with Building and Engineering" regarding their Project. Flanagan indicated the City would be asking the Vargas to submit updated plans, that the Board had no desire to "delay" the Vargas's Project, and that it wanted the Project "completed as soon as possible."

F. *The Revision 2 Plans*

The Vargas submitted updated plans (Revision 2 Plans) to the City on August 1, 2014, and to the Board on August 5. On August 6, the Board met in an executive session, acknowledged receipt of the Revision 2 Plans, and recommended the CDO remain in effect until it received more detail from the

8

Vargas, "so that both the Association and the City . . . are clear on what is being constructed." The Board authorized Flanagan and Ditty to continue to "correspond" with the Vargas and obtain "any further stipulations on clarification of the plans" prior to lifting the CDO, and "grant[ed] the two Directors the full authority to handle all issues related to this matter, including the lifting of the [CDO,] once the appropriate level of construction[-] plan detail ha[d] been received."

On August 13, the Board wrote the Vargas identifying various concerns about the Revision 2 Plans, including their intended use of the "pond"; mitigation measures—including flow calculations—they had undertaken for the additional hardscape, to reduce the chance of runoff; and the absence of perimeter fencing. The Board cautioned that submission of incomplete and "potentially misleading plans" would only further delay final approval of the Project.

Tibor responded on August 21. He took issue with the Board's statement their plans were incomplete and potentially misleading, and explained in detail what the Revision 2 Plans showed regarding the "pond" or "water containment structure," including its purpose, dimensions, and functionality. He also addressed the Board's concern about the seven-foot-wide trail leading to the easement road behind their property. He claimed the pathway was included in the plans previously approved by the ARC; and that the City had viewed the hardscape changes to be in "substantial conformance" with those plans.

In addition, Tibor pointed out that all the concrete had been poured before they received the CDO in the mail; that a licensed civil engineer had prepared the flow calculations, which he previously had submitted to the

9

City; and that he was under no obligation to provide those calculations to the Board.

G. *The Board Agrees to Lift the CDO if the City Approves the Revision 2 Plans*

Key to this appeal, the Board met in an executive session on September 3, 2014. Flanagan, Ditty, and Demere were in attendance, as was a representative from Prescott Management. The minutes from that session state in part: "The Board . . . reviewed the last correspondence sent to this owner [i.e. the Vargas] by management at the direction of the Board. The owner has contacted Management at least twice stating that all the clarification was provided to the Executive Committee and requesting the Cease and Desist order be lifted. Dick [Flanagan] and Tony [Ditty] reported that they are interfacing with the City building department to get their position on the pool/catch basin, and whether a fence will be required. It was determined that *if the City reports that all safety requirements have been met the Cease and Desist order will be lifted.*" (Italics added.) The Board subsequently approved the minutes at a later meeting.

A week later, Prescott Management e-mailed the Vargas, advising that "once confirmation has been received from the City that all drainage and hardscape construction, including the catch basin/pool area, are deemed safe by the City[,] the Cease and Desist order will likely be lifted."

H. *Defendants Refuse to Lift the CDO Despite City Approval*

On September 17, in response to questions posed by the Board, the City sent an e-mail to Prescott Management, Board members Flanagan and Ditty, and the Vargas stating the City's engineering department had no further comment on the Revision 2 Plans and was "not requesting a fence along the City easement or [the Vargas's] property line." The following day, the City

10

asked the Vargas to revise the Revision 2 Plans to change the designation of "pool" to "retaining pond" as a condition of its final approval. That same day, the City's engineering department approved the Revision 2 Plans and forwarded them to the City's Building Department.

Anxious to complete their Project, on September 18 the Vargas e-mailed the Board and Prescott Management describing the final changes to the Revision 2 Plans required by the City and included a photograph showing those changes had been made. With the City's approval and those changes detailed for the Board, the Vargas requested the Board lift the CDO without further delay. The following day, Prescott Management responded that it could not lift the CDO until the executive committee of the Board received a "satisfactory response" from "all involved departments of the City."

Five days later and after receiving no additional communication from the Board or Prescott Management, the Vargas sent a follow-up e-mail requesting that the CDO be lifted, noting the Order had been in place for about 100 days.

About an hour later, Ditty e-mailed back. He blamed the Vargas for the delay of their Project, stating the CDO was "a direct result of [their] lack of candor and penchant for cutting corners and ignoring protocol"; they had poured concrete for their seven-foot-wide path, despite receiving notice to stop all construction; and they had provided "contradictory explanations about the water containment structure." Ditty also referenced the Board's "lack of trust" of the Vargas, which for him "continue[d] to grow"; and advised that any future communication should be directed to Prescott Management and not the Board, as that was "not advancing [their] cause."

On September 25, Flanagan and Ditty e-mailed the Vargas on behalf of the Board. They continued to allege the Vargas performed construction on

11

their property without obtaining prior approval from the ARC, which included the "drive path" down to the easement road and the "pool"; and requested the Vargas submit additional plans that included a five-foot fence around the perimeter of their property, claiming the "water containment structure" posed the same safety hazards for the community as a "pool."

A few days later, the Vargas received additional correspondence from Prescott Management, "as directed by the Board." The letter noted it would be "counter-productive" to involve attorneys, as Tibor had threatened, and suggested an alternative: "If you continue to feel that the Association's conditions for plan approval as delineated in our letter of September 25 are unreasonable, the appropriate next step in the process would be Informal Dispute Resolution (IDR), [and] a meeting of the parties (not attorneys) to seek resolution."

I. *The IDR*

The parties informally met in mid-October 2014 in an attempt to resolve their dispute. At trial, Tibor testified that during the IDR, Flanagan told him if the Vargas would submit a photograph showing the five-foot masonry retaining wall was a barrier to entry, Flanagan would recommend the Board lift the CDO; and that they shook on their "verbal agreement." As requested, the Vargas submitted the requested photograph showing the five-foot barrier wall.

On October 15, 2014, as a result of the IDR and its receipt of the requested information from the Vargas, the Association confirmed the parties' agreement that would lead to the lifting of the CDO. Based on its understanding the water containment structure would be used as a "pond" "and not for swimming/wading or for aquatic life," there would be "no mechanical filters and/or pumps as equipment on the plans as approved," and

12

the two " 'windows' in the wall structure" would be "glassed-in or otherwise filled in so that the entire backside of the structure presents a 5 foot protective barrier," the Board agreed to take no further action regarding the alleged violations of the CDO and lift the Order.

Tibor refused to sign the proposed agreement. He testified the proposed agreement included terms not discussed by the parties at the IDR and omitted others they had agreed to, including requiring the Association to process any new changes to the Revision 2 Plans expeditiously. He also objected to the proposed agreement because it required them to admit wrongdoing by failing to follow the CC&Rs in constructing the Project. The Board, as a result, kept the CDO in place.

J. *The Association Fines the Vargas After the City's Final Inspection*

The City thereafter extended the Vargas's building permit, which was set to expire on August 30, 2014, for another six months. In February 2015, the City did a final inspection, accepted "the submitted as built record drawing and refunded to [the Vargas their] cash permit deposit." The Vargas, however, deemed the Project incomplete, as work "not mandated" by the City remained outstanding due to the CDO.

In September 2015, the Board summoned the Vargas to a hearing as part of its enforcement action. At the October 7, 2015 hearing, the Board fined the Vargas $75 as a result of the unresolved CDO and what it claimed was their ongoing violation of the CC&Rs.

K. *Trial Court Proceedings*

1. <u>The Operative Pleadings</u>

In April 2018, Tibor alone filed an action against the Association, Ditty, and Demere,[4] alleging causes of action for declaratory relief; breach of

---

[4]    Flanagan was not named in the lawsuit.

13

fiduciary duty; civil assault (Demere and Ditty only); and civil battery (Demere). Defendants in response moved to add Ligia as an indispensable party. After additional pleadings, the Vargas filed their second amended complaint (SAC), which is the operative pleading in this case, alleging the same four causes of action. Paragraph 36 of the SAC alleges Defendants breached their fiduciary duty by, among other acts, "refusing to rescind the Cease and Desist Notice."

### 2. Jury Trial

With the CDO still in place, the matter proceeded to a two-phase trial in August 2022. Phase one involved the Vargas's legal claims and phase two the parties' equitable claims and defenses. In phase one, the jury by special verdict found the Association breached its fiduciary duty to the Vargas by: "(1) not lifting the CDO, (2) not approving Plaintiffs' Revision 2 improvement plans within 60 days of receipt, and (3) issuing a notice of hearing on September 18, 2015, by conducting a disciplinary hearing on October 7, 2015, and by imposing a monetary fine."

The jury also found Ditty and Demere similarly breached their fiduciary duties as Board members to the Vargas; Ditty liable for assaulting Tibor; and Demere not liable for assault or battery. The jury awarded Tibor and Ligia damages for the breaches of fiduciary duty by the Association, Ditty, and Demere; and Tibor damages for Ditty's assault.

### 3. Bench Trial

Prior to the commencement of phase two involving the Vargas's declaratory relief cause of action, Defendants filed a motion to amend their answer to include the affirmative defense of equitable estoppel. The Vargas stipulated to the inclusion of this defense and the matter proceeded to a

14

bench trial in October 2022 against the Association on the sole issue of whether the June 14, 2013 CDO remained valid and enforceable.

At the conclusion of phase two, the trial court ruled the Vargas were entitled to a "limited declaration" that the CDO was no longer in force and effect. In so doing, the court rejected the Association's equitable estoppel defense, finding there was insufficient evidence that the Association relied to its detriment upon any alleged misrepresentations by the Vargas. The court noted the Association did not lift the CDO after the Vargas submitted the Revision 2 Plans due to what it considered were unsatisfactory responses to its inquires, "thus demonstrating that the [Association] was not relying on anything the Plaintiffs said or did" to support this defense.

The trial court also refused to defer to the Board's decision to keep the CDO in place for all these years. The court noted the evidence in phase two, "which presumably is the evidence upon which the jury relied in reaching its verdict" in phase one, included both the minutes of the September 3, 2014 executive committee meeting and the October 15, 2014 letter following the IDR, in which the Board expressed a willingness to overlook any alleged unauthorized improvements and lift the CDO if the Vargas filled in the two holes in the water containment structure and agreed it could not be used for swimming or aquatic life. The court found this evidence supported the finding "that perpetuation of the . . . CDO was not necessary to ensure the best interests of the [Association] and its members were protected." The court therefore declined to give deference to the decision not to lift the CDO.

4. Judgment and Postjudgment Order

On March 6, 2023, the trial court entered judgment in favor of the Vargas. On June 12, 2023, the court added an award of $337,060.90 and $32,260.98 in attorney fees and costs, respectively, to the judgment, after

15

denying Defendants' motions for new trial and judgment notwithstanding the verdict (JNOV).

On September 15, 2023, the court ordered the Association to levy a special assessment to cover the emotional distress damages in the Vargas's judgment. On January 10, 2024, the court stayed the September 15 order, ruling it would "remain in place for the duration of the pending appeal to the fullest extent of the law."

DISCUSSION

I

Breach of Fiduciary Duty

Defendants argue they owed no duty to the Vargas "to lift the CDO, unconditionally approve the Revision 2 plans, and waive Respondents' violation of the governing documents." Instead, they argue they owed a fiduciary duty to the membership of the Association as a whole and not to any one member, and that whether a duty is owed is a question of law subject to de novo review.

The Vargas argue that when Defendants established the conditions it deemed appropriate for lifting of the CDO, following the Board's executive committee session on September 3, 2014, it already had exercised the duty it owed to all members of the Association, including the Vargas; and that whether the Association breached its duty and proximately caused the Vargas damages were factual questions reviewed for substantial evidence. As we explain, both parties are partly correct.

A. *Duty*

1. <u>Guiding Principles</u>

The three elements of a breach of fiduciary cause of action are existence of a fiduciary relationship, breach of fiduciary duty, and damages. (*Oasis*

16

*West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) Whether a fiduciary duty exists is a question of law subject to de novo review. (*Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 441 (*Green Valley*).) However, whether a defendant breached its duty and caused the plaintiff damages are reviewed for substantial evidence. (*Ibid.*)

"[I]n recognition of the increasingly important role played by private homeowners' associations . . ., the courts have recognized that such associations owe a fiduciary duty to their members." (See *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 650–651 (*Cohen*), citing *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 799 (*Raven's Cove*).) This duty "extends to *individual homeowners*, not just the homeowners association." (*Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941, 945, italics added (*S & S Construction*).)

Directors of a homeowners association likewise owe a fiduciary duty to the members they serve. (Corp. Code, § 7231, subd. (a) [a director shall act "in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances"]; *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 513 (*Frances T.*) ["Directors of nonprofit corporations . . . are fiduciaries who are required to exercise their powers in accordance with the duties imposed by the Corporations Code"]; *Ravens Cove, supra*, 114 Cal.App.3d at p. 799 ["it is well-settled that directors of nonprofit corporations are fiduciaries"].)

Relevant here, homeowners associations must exercise their authority to approve or disapprove an individual homeowner's construction or improvement plans in good faith and in conformity with their declaration of

17

covenants and restrictions. (*Ironwood Owners Assn. IX v. Solomon* (1986) 178 Cal.App.3d 766, 772 (*Ironwood*) ["When a homeowners' association seeks to enforce the provisions of its [covenants, conditions, and restrictions] . . . , it is incumbent upon it to show that it has followed its own standards and procedures prior to pursuing such a remedy, that those procedures were fair and reasonable and that its substantive decision was made in good faith, and is reasonable, not arbitrary or capricious."].)

Membership in a homeowners' association is typically mandatory, as is true in the instant case, "[a]nd the powers of such associations are extensive." (*Cohen, supra*, 142 Cal.App.3d at p. 651.) A member is required to submit to the authority of the association, which includes " 'restrictions upon the use and enjoyment of the property contained in the declaration.' " (*Ibid.*) "With power, of course, comes the potential for abuse. Therefore, the [a]ssociation must be held to a high standard of responsibility: 'The business and governmental aspects of the association and the association's relationship to its members clearly give rise to a special sense of responsibility upon the officers and directors . . . . This special responsibility is manifested in the requirements of fiduciary duties and the requirements of due process, equal protection, and fair dealing.' " (*Ibid.*)

2. Analysis

Based on the foregoing authorities, we independently conclude the Association and Board members Ditty and Demere owed the Vargas a fiduciary duty to exercise their authority over the Vargas's Project in good faith and in conformity with their own directives and the CC&Rs. (See *Ironwood, supra*, 178 Cal.App.3d at p. 772; *S & S Construction, supra*, 151 Cal.App.3d at p. 945; *Cohen, supra*, 142 Cal.App.3d at pp. 650–651.)

18

In mid-August 2014, the Board informed the Vargas it could not approve their Revision 2 Plans due to ongoing concerns regarding the "water containment structure"; the scope of the backyard hardscape; and the lack of any fencing around their property, which allegedly posed a threat to public safety due to the water containment structure. In response, the Vargas noted the Revision 2 Plans included the purpose, dimensions, and functionality of the water containment structure. They noted the structure was "sheltered on three sides by buildings" and "enclosed on two sides with a wall measur[ing] about 5 feet from the outside and about 3 to 4 feet from the inside[,] forming an[] 'interior courtyard.' "

Regarding the backyard hardscape, the Vargas claimed the seven-foot-wide trail leading to the easement road "was clearly shown on the plans approved by the [Association]," and that the City viewed the hardscape changes to be in "substantial conformance" with those plans. Finally, because the water containment structure was "walled off" and "protected from the outside by 5-foot tall walls and building walls with controllable entry/exit points," they considered a perimeter fence unnecessary.

As summarized *ante*, against this backdrop the Board's executive committee met on September 3, 2014. The minutes from that meeting—subsequently approved by the Board—provided that executive committee members Flanagan and Ditty were "interfacing with the City building department to get their position on the pool/catch basin, and whether a fence will be required"; and that "if the City reports that all safety requirements have been met the Cease and Desist order will be lifted."

A week later, Prescott Management wrote the Vargas "that once confirmation has been received from the City that all drainage and hardscape construction, including the catch basin/pool area, are deemed safe by the

19

City[,] the Cease and Desist order will likely be lifted. The Executive Committee will communicate the City's decision to [Prescott Management] at their earliest opportunity, which will in turn be communicated to you." Both Flanagan and Ditty were included on Prescott Management's September 10 e-mail to the Vargas.

That confirmation came on September 17, 2014, when the City notified Prescott Management, Board members Flanagan and Ditty, and the Vargas that the City's engineering department had no further comment on the Revision 2 Plans, that it was "not requesting a fence along the City easement or [the Vargas's] property line," and that it had approved the Revision 2 Plans after the Vargas revised them to change the designation of "pool" to "retaining pond." The following day, the Vargas sent Prescott Management a copy of the City's approval stamp and asked the Association to lift the CDO "without further delay."

Thus, the record belies Defendants' contention on appeal that it did not owe a fiduciary duty to the Vargas "to decide one way or the other" whether to approve the Revision 2 Plans and lift the CDO. To the contrary, that duty arose on September 17, 2014, when the City approved the Revision 2 Plans, thereby triggering Defendants' self-imposed obligation to lift the CDO, per the Board's decision at its September 3 executive session.[5]

Defendants, however, argue that "several" Supreme Court cases establish that a homeowners association's fiduciary duty is to the

---

[5]    Accordingly, we conclude the trial court properly instructed the jury with Judicial Council of California Civil Jury Instruction (CACI) No. 4100 as follows: "A Homeowners' Association and its Board Members owe a fiduciary duty to their Homeowners. A fiduciary duty imposes on a Homeowners' Association and its Board Members a duty to act with the utmost good faith in the best interests of their Homeowners."

20

membership as a whole and not to any individual member. We note that Defendants cite to only one Supreme Court case, *Frances T.*, which, as we explain, is inapposite, and merely distinguish one or two other cases that suggest a fiduciary duty is owed to individual members of an association.

*Frances T.* involved an action brought by an owner against a homeowners association and the individual members of its board, after she was raped and robbed in her unit by an unknown third party. (*Frances T.*, *supra*, 42 Cal.3d at p. 495.) As relevant to our discussion, the plaintiff alleged causes of action for negligence and breach of fiduciary duty, averring the defendants failed to provide adequate exterior lighting in the common area near the plaintiff's unit and required her to remove lighting she had installed at her own expense. (*Id.* at p. 498.) *Frances T.* concluded the trial court erred in granting the defendants' demurrer on the plaintiff's negligence cause of action, holding the defendants owed her the same duty of care a landlord owed a tenant in a "traditional landlord-tenant relationship." (*Ibid.*)

Although it reversed that portion of the judgment sustaining the defendants' demurrer to the plaintiff's negligence cause of action, *Frances T.* affirmed the judgment as to the plaintiff's breach of fiduciary cause of action. (*Frances T.*, *supra*, 42 Cal.3d at p. 514.) In so doing, the court noted the plaintiff's allegations against the association involved only its "duty to her as a tenant rather than as a shareholder" (*ibid.*), and that a fiduciary relationship generally does not exist between a tenant and landlord (*id.* at p. 513). As to the individual board members, the court found the plaintiff had "alleged no facts to show that these directors had a fiduciary duty to serve as the Project's landlord." (*ibid.*)

Preliminarily, we disagree with Defendants' assertion that *Frances T.* upheld the dismissal of the plaintiff's breach of fiduciary duty cause of action

21

based on its conclusion the homeowners association and/or its individual directors owed a duty to the membership as a whole but not to the plaintiff individually.  In our view, *Frances T.* upheld the dismissal of the fiduciary duty cause of action based on its conclusion there was no *breach* of duty by the defendants.

*Frances T.* noted the defendants "*fulfilled*" their fiduciary duty "by strictly enforcing the provision in the CC&Rs that prohibited alteration of the common areas except with the prior written consent of the board" (*Frances T., supra*, 42 Cal.3d at p. 514, italics added); that the "directors," as opposed to the homeowners association, "had *no fiduciary duty* to exercise their discretion one way or the other with regard to plaintiff's lighting so long as their *conduct* conformed to the standard set out in section 7231 [of the Corporations Code]" (i.e., they acted in good faith) (*Frances T.*, at p. 514, second italics added); and that because, as to the directors, "a good faith mistake in business judgment does not *breach* the statutory standard, plaintiff's third claim [for breach of fiduciary duty] does not state a cause of action" (*ibid.*, italics added).

*Frances T.* is also factually distinguishable from the instant case.  The basis of the Vargas's breach of fiduciary duty cause of action stems not from allegations they were in a traditional landlord-tenant relationship with Defendants, or that Defendants failed to protect them from foreseeable criminal acts of third parties, but rather as a result of Defendants' handling (or mishandling) of the Vargas's Project.  This duty arose not from a "common law relationship" between the parties, as was the case in *Frances T.* (*Frances*

22

*T.*, *supra*, 42 Cal.3d at p. 513), but from the Association's CC&Rs[6] and the standards and criteria Defendants alone established for the Vargas's Project. We therefore reject Defendants' contention they did not owe a fiduciary duty to the Vargas.

B. *Breach*

Defendants contend the judgment should be reversed because the jury erroneously found they breached their fiduciary duties. Defendants contend there was no breach because the Vargas's plans were "nonconforming" and included "a structure whose use *to this day* remains undefined." We find this contention unavailing.

1. Additional Background

The Vargas's homeowners association expert, Robert Griswold, testified concerning the standards of care applicable to Defendants and their handling of the Vargas's Project. Griswold opined that the Association fell below the standard of care when it refused to lift the CDO following the Board's September 3, 2014, executive committee session and the City's decision two weeks later approving the Revision 2 Plans. Griswold noted the Defendants still had not lifted the Order at the time of trial in August 2022, *years* after the City gave its final approval.

---

[6] The CC&Rs provide in part, "[n]o alterations in the exterior design or color of any structure*, including additions*, shall be made without the prior written approval of the ARC." (Art. V, § 1. (b), italics added.) Article 6 provides an owner must seek prior written approval of the ARC "for structures, additions, fences, pools, patio structures, outbuildings, landscaping and all other improvements to be made to any Lot" (Art. VI, § 1); the ARC shall review the plans and specifications and if written approval is not forthcoming within sixty days from the date of receipt of said submittals, "such inaction shall be deemed to be approval" (*id.*, § 3); and enforcement of the ARC and Board decisions, following an appeal from a decision of the ARC, "shall be the responsibility of the Board" (*id.*, § 7).

23

Griswold also rejected the Board's position that it had the authority, separate and apart from the City, to impose additional safety requirements on the Vargas before approving their Project and lifting the CDO. Griswold opined the Board's concern about being sued due to the water containment structure was overblown. He added the City's experts, including engineers and architects, had reviewed the Revision 2 Plans for compliance with state and local building codes; that once the City approved the Vargas's Revision 2 Plans, Defendants should have lifted the CDO; that in refusing to do so, they took the position they knew more about safety and building codes than the City's experts; and that the City, and not Defendants, were the "final authority" when it came to compliance issues.

Moreover, although the City sent the Vargas a settlement proposal in October 2014 that potentially would have resolved the parties' dispute, Griswold opined the Vargas were not unreasonable in rejecting that proposal because it required them to admit wrongdoing. In his opinion, that was "a real big sticking point" for Defendants, as the issue for them became more about "egos or personalities" and less about the Vargas's Project.

2. Analysis

We conclude the evidence is more than sufficient to support the jury's finding that Defendants breached their fiduciary duty to the Vargas when they refused to lift the CDO, after the City determined no further safety measures were necessary.[7] (See *Green Valley, supra*, 241 Cal.App.4th at

_____

[7] As a result of our decision, we deem it unnecessary to decide whether the jury erred when it separately found Defendants breached their fiduciary duties by (1) failing to approve the Revision 2 Plans within 60 days of the Vargas's submission and (2) imposing a fine on the Vargas in late 2015 in support of Defendants' enforcement action.

24

p. 441; accord, *Elation Systems, Inc. v. Fenn Bridge LLC* (2021) 71 Cal.App.5th 958, 964 (*Elation*) [substantial evidence is " ' "such evidence as a reasonable fact trier might accept as adequate to support a conclusion; evidence which has ponderable legal significance, which is reasonable in nature, credible and of solid value" ' "].)[8]

When the Board made its decision on September 3, 2014, it had all the necessary information regarding the Project, including the water containment structure. Thus, whether or not the Revisions 2 Plans allegedly were "nonconforming" was *then* immaterial to the Board's decision to lift the CDO. In our view, what Defendants are asking us to do now is reweigh the evidence and the credibility of the parties and make a new finding in their favor. This we cannot and will not do. (See *Elation, supra*, 71 Cal.App.5th at p. 964; *Green Valley, supra*, 241 Cal.App.4th at p. 441; accord, *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 ["[t]he Court of Appeal is not a second trier of fact"].)

C. *The Rule of Judicial Deference*

Defendants contend the trial court erred when it failed to afford judicial deference to the Association's decision not to lift the CDO, following the City's approval of the Project. Specifically, they contend the court ignored their "presumed expertise" and "overstepped" its authority by accepting the Vargas's "argument that the City's approval of Respondents' Revision 2 plans

---

8    In light of our decision, we reject Defendants' alternate contention that, absent a fiduciary duty, the Vargas's claim against Defendants was merely one for breach of contract (i.e., based on the CC&Rs), which precludes recovery of noneconomic damages. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 559 ["damages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California"].)

should have ended Appellants' inquiry, truncating [their] decision to place reasonable conditions on its approval."  We are not persuaded.

     1.  <u>Guiding Principles</u>

     The Supreme Court in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 253 (*Lamden*) adopted a rule of judicial deference when the board of a homeowners association, "upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions."

     The rule of judicial deference, like the related business judgment rule (discussed *post*), is an affirmative defense.  (*Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1122–1123.)  Defendants therefore had the burden of establishing the requisite elements for applying the rule.  (*Affan v. Portofino Cove Homeowners Assn.* (2010) 189 Cal.App.4th 930, 941–942 (*Affan*).)  Where, as here, the trier of fact finds the defendant failed to meet this burden, the issue on appeal becomes " 'whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic*); accord *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's*).)

     To satisfy this burden on appeal, the defendant must show the evidence supporting that new finding was " '(1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Sonic, supra*, 196 Cal.App.4th at p. 466; accord, *Dreyer's, supra*, 218 Cal.App.4th at p. 838.) " 'This is 'an onerous standard' [citation] and one that is 'almost impossible'

for a losing [party] to meet, because unless the trier of fact made specific factual findings in favor of the losing [party], we presume the trier of fact concluded that '[the party's] evidence lacks sufficient weight and credibility to carry the burden of proof.' " (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651 (*Estes*), citing *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164 and *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

The *Lamden* rule is not unlimited. (*Affan*, *supra*, 189 Cal.App.4th at p. 940.) "It is a rule of deference to the *reasoned decisionmaking* of homeowners association boards concerning ordinary maintenance. It does not create a blanket immunity for all the decisions and actions of a homeowners association. The Supreme Court's precise articulation of the rule makes clear that the rule of deference applies only when a homeowner sues an association . . . that meets the enumerated criteria." (*Ibid.*; *id.* at p. 943 [homeowners association "failed to establish the factual prerequisites for applying the rule of judicial deference" at trial, where "there was no evidence the board engaged in 'reasonable investigation' [citation] before choosing to continue its 'piecemeal' approach to sewage backups"].)

2. <u>Analysis</u>

This case *may* have been turned out differently had the Board not resolved on September 3, 2014, to lift the CDO if the City reported no safety concerns regarding the Vargas's Revision 2 Plans. The Vargas own expert acknowledged that the Board's initial issuance of the CDO, directing the Vargas to stop "all work on their driveway" (i.e., trail) pending the July 9 2014 Board meeting, was "appropriate." If the Vargas *then* had challenged that decision, the Defendants would have a stronger argument for application of the rule of judicial deference to the Association's decision making.

But that finding would require us to ignore the evidence, summarized *ante*, that the Association decided against lifting the CDO, after repeatedly representing (including through its manager) that it would do so if and when the City determined the Vargas's Revision 2 Plans met all safety measures. The court found this evidence supported its decision in phase two of the trial that "perpetuation of the . . . CDO was not necessary to ensure that the best interests of the [Association] and its members were protected"; and that, in light of the jury's breach of fiduciary duty findings against the Association, "and given the absence of sufficient evidence to demonstrate that a reversal of the September 3, 2014 decision was in the best interest of the [Association] and its members," application of the rule of judicial deference was unwarranted.

Relying on a string of cases including *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809 (*Harvey*), Defendants contend the trial court erred by refusing to apply the rule of judicial deference to the Association. In *Harvey*, we applied the *Lamden* rule to uphold summary judgment for the homeowners association, concluding the "undisputed" evidence showed the board of the association, "upon reasonable investigation" and in "good faith," properly exercised its discretion to allow homeowners to use, under certain conditions, portions of the common area for storage. (*Id.* at pp. 820–822.)

Defendants reliance on *Harvey* is misplaced, as the jury here found the Association failed to act in good faith in exercising, through the Board, its "authority and presumed expertise" with respect to the Vargas's Project. (See *Harvey, supra*, 162 Cal.App.4th 820–821.) The record therefore does not compel a favorable finding for the Association as to this defense. (See *Estes,*

28

*supra*, 51 Cal.App.5th at p. 651; *Dreyer's, supra*, 218 Cal.App.4th at p. 838; *Sonic, supra*, 196 Cal.App.4th at p. 466.)

D. *The Business Judgment Rule*

Defendants similarly contend the business judgment rule, codified in Corporations Code section 7231,[9] applied to the Board's decision making regarding the imposition of, and ultimately its choice not to lift, the CDO, due to what it claimed were ongoing safety concerns. For reasons already discussed, we conclude this related rule of deference does not apply in this case.

1. Guiding Principles

"The business judgment rule is a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. [Citation.] 'The rule is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. [Citations.] The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict

---

9    As noted, Corporations Code section 7231, subdivision (a) requires a director to act in "good faith" in the performance of his or her duties and with "such care" as an "ordinarily prudent person in a like position would use under similar circumstances." Subdivision (c) of this statute goes on to state that "[a] person who performs the duties of a director in accordance [with the preceding subdivisions] . . . shall have no liability based upon any alleged failure to discharge the person's obligations as a director." (Corp. Code, § 7231, subd. (c).)

of interest.' " (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 429–430 (*Everest*).)

As was the case with the rule of judicial deference applicable to a homeowners association, a court is required to defer to the discretionary decision making of board members of an association only if they acted in good faith. (See, e.g., *Lamden, supra*, 21 Cal.4th at p. 257 [" 'The . . . business judgment rule . . . insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest.' "]; accord, *Lauckhart v. El Macero Homeowners Assn.* (2023) 92 Cal.App.5th 889, 906 [" 'The [business judgment] rule . . . prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest.' "]; *Everest, supra*, 114 Cal.App.4th at pp. 429–430.)

2. Analysis

Similar to its findings regarding the Association, the jury found Ditty and Demere failed to act in good faith "when making decisions about how to handle the issues related to the Vargas' home improvement project." We conclude substantial evidence supports these findings. (*Elation, supra*, 71 Cal.App.5th at p. 964; *Green Valley, supra*, 241 Cal.App.4th at p. 441.)

As summarized, both Board members attended the September 3, 2014 executive session; both were involved in the ongoing dispute involving the Vargas's Project, as Demere expressed concerns about the scope of the Project to Flanagan and sat on the Board when it decided not to lift the CDO; and Ditty, for his part, was on the executive committee formed by the Board and was the Board member who e-mailed Tibor on September 23, 2014, blaming the Vargas for "cutting corners and ignoring protocol," and accusing them of "lack[ing] candor."

As we have discussed, the trial court relied on the jury's findings, as well as the evidence adduced in phase two of the trial—including the absence of evidence demonstrating that a reversal of the September 3, 2014, decision of the executive committee was in the best interest of the Association and its members—when it ruled no deference should be given to the Board's decision to keep the CDO in place.

In light of these facts, we conclude the evidence does not, as a matter of law, compel a finding that the business judgment rule applied to the decision making of Ditty and Demere to keep the CDO in place, following the City's approvals. (See *Estes, supra*, 51 Cal.App.5th at p. 651; *Dreyer's, supra*, 218 Cal.App.4th at p. 838; *Sonic, supra*, 196 Cal.App.4th at p. 466.)

II

Ligia's Emotional Distress Damages

Defendants contend the trial court erred when it applied the "continuing violation doctrine" and found Ligia's claim of emotional distress damages was not time-barred. We disagree.

A. *Additional Background*

In their respective post-trial motions, Defendants contended—ostensibly for the first time—that Ligia's breach of fiduciary claim was time-barred. The trial court disagreed. In so doing, it recounted in detail the procedural history of the case.

Briefly, Tibor alone filed a complaint against Defendants on April 5, 2018, which he amended later that year. In December 2019, Defendants filed a motion to add Ligia as an indispensable party. In February 2020, the trial court granted that motion in part, ordering that Ligia be added to Tibor's breach of fiduciary and declaratory relief causes of action. On March 13,

31

2020, the Vargas filed their SAC, which, for the first time, included Ligia as a party.

The trial court found the four-year statute of limitations applied to Ligia's breach of fiduciary duty claim; that her claim accrued in September/October 2014, based on Griswold's opinion that the Association then should have lifted the CDO; and that Ligia therefore should have asserted her claims "no later than September or October 2018." The court, however, found Defendants engaged in "an indivisible pattern of conduct sufficient to toll the statute of limitations under the continuing violation doctrine"; it therefore denied their respective new trial and JNOV motions.

B. *Governing Principles*

The statute of limitations for breach of fiduciary duty for nonfraudulent conduct is four years. (Code Civ. Proc., § 343[10]; *William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1312 ["[b]reach of fiduciary duty not amounting to fraud or constructive fraud is subject to the four-year 'catch-all statute' of Code of Civil Procedure section 343"]; accord, *City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 889 [four-year statute of limitations applies to breach of fiduciary duty, unless the gravamen of the claim is actual or constructive fraud, in which case the statute of limitations is three years].)

The period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues. (Code Civ. Proc., § 312 [an action must "be commenced within the periods prescribed in this title, after the cause of action shall have accrued"].) "Traditionally at common law, a 'cause of action

---

[10] Code of Civil Procedure section 343 provides: "An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued."

accrues "when [it] is complete with all of its elements"—those elements being wrongdoing, harm, and causation.' " (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*), quoting *Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797.) "This is the 'last element' accrual rule: ordinarily, the statute of limitations runs from 'the occurrence of the last element essential to the cause of action.' " (*Aryeh*, at p. 1191, quoting *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187.)

"To align the actual application of the limitations defense more closely with the policy goals animating it, the courts and the Legislature have over time developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods. These doctrines may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both." (*Aryeh, supra*, 55 Cal.4th at p. 1192.) One such exception is the continuing violation doctrine.

" 'The continuing violation doctrine aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them.' " (*Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1124, quoting *Aryeh, supra*, 55 Cal.4th at p. 1192.) "Consequently, the continuing violation doctrine 'allows liability for unlawful . . . conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period.' " (*Willis*, at p. 1124, quoting *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 802.) "For the continuing violation doctrine to apply, a plaintiff must show the defendant engaged in 'a pattern of reasonably frequent and similar acts [that] may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety,

notwithstanding that the conduct occurred partially outside and partially inside the limitations period.' " (*Willis*, at p. 1124, quoting *Aryeh*, at p. 1198.)

C. *Analysis*

Defendants contend the trial court erroneously applied the continuing violation doctrine when it found they engaged in "an indivisible pattern of conduct sufficient to toll the statute of limitations," after Defendants refused to lift the CDO "in derogation of [the Board's] September 3, 2014 minutes." Defendants claim their "last act" regarding the CDO took place on October 16, 2015, when they fined the Vargas as part of their enforcement action; and that Ligia's cause of action was time-barred under the four-year limitations period because she did not join the action until March 13, 2020, when the Vargas filed their SAC.

Initially, we note that Defendants have failed to set forth the standard of review applicable to their claim of error on this issue. " 'Arguments should be tailored according to the applicable standard of appellate review.' Failure to acknowledge the proper scope of review is a concession of a lack of merit." (*Sonic*, *supra*, 196 Cal.App.4th at p. 465.)

Reaching the merits, we independently conclude it would be inequitable under the facts of this case to apply the four-year limitations period and bar Ligia's breach of fiduciary duty claim against Defendants. Significantly, it was Defendants who brought Ligia into this case when they filed a motion in December 2019 to add her as an indispensable party, ostensibly *after* the applicable four-year limitations period had run, as they now claim on

34

appeal.[11]  In addition, Defendants neither raised the statute of limitations defense in their unsuccessful summary judgment motion, which they filed in October 2020, or during phase one of the trial, when the jury was empaneled. (See *Bartel v. Chicago Title Ins. Co.* (2025) 111 Cal.App.5th 655, 679 (*Bartel*) ["resolution of the statute of limitations is normally a question for the trier of fact"].)

In addition, Ligia's claim for damages against Defendants was not based on contract principles, as Defendants posit, but instead on their breaches of fiduciary duty as a result of her being a homeowner in the Lomas Serenas residential development.  As we have noted, this duty is ongoing and requires the Association, through its Board, to act with the utmost good faith and in the best interests of Ligia, Tibor, and the other members of the Association, to follow its own standards and procedures, and to ensure those procedures are fair and reasonable and not arbitrary or capricious.  (See CACI No. 4100; *Ironwood, supra,* 178 Cal.App.3d at p. 772; *S & S*

---

[11]  Perhaps anticipating a forfeiture argument by the Vargas, Defendants contend in their opening brief that the statute of limitations is "jurisdictional" and cannot be waived, as support citing *Cowan v. Superior Court* (1996) 14 Cal.4th 367.  Although the Vargas have not specifically addressed this issue on appeal, we are constrained to point out that the statute of limitations most certainly can be waived.  (See, e.g., *Adams v. Paul* (1995) 11 Cal.4th 583, 597 ["The statute of limitations is an affirmative defense that is forfeited if not appropriately invoked by the defendant."]; accord, *Shenefield v. Kovtun* (2024) 106 Cal.App.5th 925, 934 ["If not timely and appropriately invoked by a defendant, a statute of limitations defense is waived."].)  *Cowan* does not hold otherwise.  (*Cowan,* at pp. 370–371 [the defendant, facing capital murder charges, may waive the statute of limitations and plead guilty to the lesser included offense of voluntary manslaughter when it is to his benefit, even though prosecution of that lesser offense was time-barred].)

*Construction, supra*, 151 Cal.App.3d at p. 945; *Cohen, supra*, 142 Cal.App.3d at pp. 650–651.)

Defendants' duty to Ligia therefore did not end when they decided in September/October 2014 to keep the CDO in place (indefinitely), thereby placing the burden on her and her husband to take affirmative steps to rescind the CDO. The burden instead was on Defendants to follow the Board's directives and the Association's "Rules Enforcement Policy," which was in place at all times relevant in this case, and which applied to "all violations and infractions of the governing documents."

The Rules Enforcement Policy provides, "[i]f the violation continues, or if the response [by the homeowner] is otherwise unsatisfactory, even after the imposition of a monetary penalty, the Board or its appointed committee may impose additional or continuing fines until such time as the matter is satisfactorily resolved." And, if the matter is not satisfactorily resolved after a fine has been issued, as occurred here, "the Board may refer the matter to the Association's legal counsel," which may result in the homeowner being sued and "liable for the Association's legal costs and fees." Here, however, there is no indication in the record that, following their imposition of the fine against the Vargas in October 2015, *Defendants* took any additional steps to "satisfactorily resolve[ ]" the parties' dispute over the CDO.

Under these circumstances, we conclude it would be inequitable for Defendants to leave the CDO in place for years, despite having an ongoing fiduciary duty to Ligia and a procedure in place to end continuing "violations and infractions of the governing documents"; to force her into this lawsuit by claiming she was an indispensable party, only to later assert that, when it did so, the applicable statute of limitations had run; and then to wait until their posttrial motions to raise the limitations bar, when the question

36

regarding its application could have been resolved by the jury in phase one, given the facts on which this defense was based were susceptible of more than one "legitimate inference." (*Jolly v. Eli Lilly Co.* (1988) 44 Cal.3d 1103, 1112; *Bartel, supra*, 111 Cal.App.5th at p. 679.)

In reaching our decision, we find *Vaca v. Wachovia Mortgage Corp.* (2011) 198 Cal.App.4th 737 (*Vaca*) inapposite. In *Vaca*, the Court of Appeal affirmed the judgment of dismissal following the sustaining of the defendants' demurrer. (*Id.* at p. 740.) In rejecting the plaintiff's claim the defendants engaged in "continuing wrongs" that postponed the start of the limitations period, the *Vaca* court noted the plaintiff's amended complaint included "no allegations defendants did anything wrong after making the fraudulent mortgage loans in 2000 and 2001" (*id.* at pp. 744–745); contrasted a continuing wrong from a continuing injury (*id.* at p. 745); and concluded a continuing injury sustained in consequence of a completed wrong will not delay the commencement of the statute of limitations (*ibid.*).

Unlike the facts of *Vaca*, in which the plaintiff complained she continued to suffer injury years after discovering the defendants' wrongdoing (by fixed dates), here Defendants' wrongdoing continued up until they were ordered to lift the CDO in late 2022, based on the ongoing fiduciary duties they owed the Vargas. (See *Aryeh, supra*, 55 Cal.4th at p. 1198 ["[W]here misfeasance is ongoing, a defendant's claim to repose, the principal justification underlying the limitations defense, is vitiated."]) *Vaca* therefore does not inform our analysis in this case.

Assault

Ditty contends the evidence is insufficient to support the jury's finding he "threaten[ed] to touch Tibor Varga in a harmful or an offensive manner." We disagree.

A. *Additional Background*

Tibor testified he attended the Board's April 6, 2016 open forum meeting. Prior to the meeting, he sent an e-mail regarding his perceived right to photograph the Board and record the meeting, noting it twice had refused such requests, including on July 9, 2014, when he had been summoned to appear following the issuance of the CDO. With his camera in the off position, Tibor began to address the Board when Ditty suddenly "jump[ed] up and rush[ed]" him, coming so close Tibor could "feel" Ditty's "body heat." Tibor repeatedly yelled, " 'Do not touch me. Do not touch me.' " At about the same time, Demere also approached Tibor and attempted to "manipulate" Tibor's camera. While remaining seated, Tibor turned his camera on to deter Ditty and Demere from "physically harming" him. Demere responded by "pushing the buttons" of the camera to interfere with Tibor's recording.

Tibor, however, was able to capture "two small snippets" of the altercation thatwere shown to the jury. During one such recording, Ditty demanded that Tibor erase any video and asked Tibor if he was "enjoying this."

B. *Guiding Principles*

We review the jury's factual findings for substantial evidence. (*Elation, supra*, 71 Cal.App.5th at p. 964; *Green Valley, supra*, 241 Cal.App.4th at

p. 441.) "We will reverse a jury's verdict only if it is unsupported by any substantial evidence, meaning to prevail on appeal defendants must show that the evidence was such as would justify a directed verdict in their favor." (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251, citations omitted (*Mathews*).)

" 'Generally speaking, an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present.' [Citation.] A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." (*Lowry v. Standard Oil Co.* (1944) 63 Cal.App.2d 1, 6–7 (*Lowry*) [pointing a gun at another may constitute assault unless the person knows the gun is unloaded].) "Apprehension of harmful or offensive contact, intentionally done, is the basis of assault. [Citation.] Mere words, however threatening, will not amount to an assault. [Citation.] The tort of assault is complete when the anticipation of harm occurs." (Thomas et al., Cal. Civil Practice: Torts (2021) § 12:4, citing among other authorities *Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal. App. 3d 222, 232.)

C. *Analysis*

The record shows Ditty "jumped up" and "rushed" Tibor at the April 6 Board meeting, coming so close Tibor could "feel" Ditty's "body heat." Ditty did so almost immediately after Tibor placed his camera in front of him and began addressing the Board regarding his purported right to record the meeting and photograph the Board. Afraid he would be "physically harmed," Tibor turned on his camera, while repeatedly yelling, " 'Do not touch me.' " Tibor was "shaken" by the incident, testifying that everyone at the meeting was in "shock[ ]."

This evidence alone is sufficient to support the jury's finding of threatened harmful or offensive contact by Ditty. But the record also shows there was a prior history between Ditty and Tibor leading up to the April 6 Board meeting. This evidence further supports the jury's assault finding.

As summarized, on September 23, 2014, Ditty responded to an e-mail Tibor had sent about an hour earlier, asking whether the Vargas's contractor could resume construction. Ditty wrote the "current situation" involving the CDO was "a direct result of [the Vargas's] lack of candor and penchant for cutting corners and ignoring protocol"; that their plans had been "grossly inadequate," "misleading," and "intentionally vague"; and that they had only themselves to blame for their current situation. Based on this and other evidence, Griswold opined the issue for Defendants—including Ditty— became more about "egos" and "personalities" and less about the Vargas's Project and resolving the parties' stalemate.

When viewed in its entirety, we conclude this evidence—including the reasonable inferences to be drawn from it (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1492)—amply supports the jury's finding that Ditty "threaten[ed]" to touch Tibor "in a harmful or an offensive manner." (See *Elation, supra*, 71 Cal.App.5th at p. 964; *Mathews, supra*, 43 Cal.App.5th at p. 251.)

In reaching our decision, we find the decision of *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590 (*Plotnik*), on which Ditty relies, distinguishable. There, the Court of Appeal relied on Penal Code section 240,[12] and cases interpreting *criminal* assault, to reverse a portion of a judgment based on the

---

[12]    Penal Code section 240 defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

defendants' civil assault of the plaintiff. (*Plotnik,* at p. 1604.) In reaching its decision, *Plotnik* found there was insufficient evidence that the defendants "committed an act that could or was 'inten[ded] . . . to inflict immediate injury' " on the plaintiff. (*Ibid.*)

Here, we conclude the trial court properly instructed the jury regarding the elements of *civil* assault when it gave CACI No. 1301.[13] In addition, we note Ditty did not object to CACI No. 1301 at trial. (See *Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 ["When a trial court gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive [or forfeit] a party's right to later complain on appeal about the instruction which was given."].)

Finally, unlike the facts of *Plotnik*, we conclude there is sufficient evidence in the record to support the jury's finding that Ditty "committed an act that could or was 'inten[ded] . . . to inflict immediate injury' " on Tibor. (See *Plotnik, supra*, 208 Cal.App.4th at p. 1604.) For all these reasons, we reject Ditty's claim of error based on insufficiency of the evidence.

---

[13] The trial court instructed the jury with CACI No. 1301 as follows: "Tibor Varga claims that Thomas Demere and Anthony T. Ditty assaulted him. To establish this claim, Tibor Varga must prove all of the following: [¶] 1. That Thomas Demere and Anthony T. Ditty each threatened to touch Tibor Varga in a harmful or an offensive manner; [¶] 2. That it reasonably appeared to Tibor Varga that Thomas Demere and Anthony T. Ditty were about to carry out the threat; 3. That Tibor Varga did not consent to Thomas Demere and Anthony T. Ditty's conduct; [¶] 4. That Tibor Varga was harmed; and [¶] 5. That Thomas Demere and Anthony T. Ditty's conduct was a substantial factor in causing Tibor Varga's harm. [¶] A touching is offensive if it offends a reasonable sense of personal dignity. [¶] Words alone do not amount to an assault." As noted, the jury found Demere not liable for assault of Tibor.

41

IV

Special Assessment

Defendants contend the trial court erred when, in response to the Vargas's postjudgment motion, it ordered the Association to levy an emergency special assessment on its members to pay the money portion of the judgment. The Vargas counter, arguing this issue is "academic" because the court stayed the order until this appeal is final. We agree with the Vargas.

A. *Additional Background*

Following entry of judgment, in July 2023 the Association notified its members that a special assessment may be necessary to cover the Vargas's damage awards. After receiving verified copies of the Association's financial records, the Vargas moved for an order directing the trial court to levy the assessment pursuant to Civil Code section 5610, subdivision (a).[14] This statute is an exception to Civil Code section 5605, subdivision (a),[15] which limits a common interest development's ability to impose regular and special assessments on its members.

---

[14]    Civil Code section 5610 provides in part: "[Civil Code s]ection 5605 does not limit assessment increases necessary for emergency situations. For purposes of this section, an emergency situation is any one of the following: [¶] (a) An extraordinary expense required by an order of a court." (Civ. Code, § 5610, subd. (a).)

[15]    Subdivision (a) of Civil Code section 5605 states: "Annual increases in regular assessments for any fiscal year shall not be imposed unless the board [of a common interest development] has complied with paragraphs (1), (2), (4), (5), (6), (7), and (8) of subdivision (b) of Section 5300 with respect to that fiscal year, or has obtained the approval of a majority of a quorum of members, pursuant to Section 4070, at a member meeting or election."

42

In its September 15, 2023 order granting the Vargas's motion, the trial court found the Association lacked executable assets to pay the judgment or post a bond to stay enforcement, and had decided against levying the assessment on its members. In making its decision, the court relied on *James F. O'Toole Co., Inc. v. Los Angeles Kingsbury Court Owners Assn.* (2005) 126 Cal.App.4th 549 (*O'Toole*). *O'Toole* held the plaintiff's judgment against the defendant homeowners association was an "extraordinary expense," requiring the association to levy a special emergency assessment to pay the plaintiff, which had provided work that benefited the association and its members following the 1994 Northridge earthquake. (*Id.* at p. 555.)

Key to the issue on appeal, on January 10, 2024, the trial court stayed its September 15 order, ruling it would "remain in place for the duration of the pending appeal to the fullest extent of the law."

B. *Analysis*

Defendants concede that, if the judgment is affirmed after exhaustion of their appellate rights, the Vargas are "protected by . . . the certainty of collecting under *O'Toole*." In light of this concession and the trial court's stay of the September 15 order for the duration of this appeal, we deem it unnecessary to resolve this issue on appeal.

On the one hand, if Defendants subsequently succeed in overturning the judgment in this case, the September 15 order imposing the levy will likely become moot. (See *Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [a court is tasked with the duty " 'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon . . . abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it' "]; accord, *Shaw v. Los Angeles Unified School Dist.* (2023) 95 Cal.App.5th 740, 772 ["It

43

is well settled that appellate courts will decide only actual controversies.  We will not opine on moot questions or abstract propositions, nor declare principles of law that cannot affect the matter at issue on appeal."].)  On the other hand, if Defendants are unsuccessful in any further appeal, they concede the Vargas are entitled to relief under Civil Code section 5610, subdivision (a), as set forth in the September 15 order.

DISPOSITION

The judgment is affirmed.  The Vargas are entitled to their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.